UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS EQUITY, L.L.C. D/B/A
GALATOIRE'S RESTAURANT AND
GALATOIRE'S 33 BAR & STEAK

                              Plaintiff

VERSUS

U.S. SPECIALTY INSURANCE
COMPANY

                            Defendant

CIVIL ACTION NO. 20-1935

SECTION: "M"(2)

JUDGE:  HON. BARRY W. ASHE

MAGISTRATE:
  HON. DONNA PHILLIPS CURRAULT

## UNSWORN DECLARATION OF SKYE MILES PURSUANT TO 28 U.S.C. § 1746

I, **SKYE MILES**, declare the following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am over eighteen years of age, am competent to give this declaration, which declaration is based upon personal information and knowledge.

2. I am a Senior Compliance Manager for U.S. Specialty Insurance Company ("USSIC").  I am responsible for handling the litigation involving claim number RRI-19-00173 under Policy No. U719-860418 ("Policy") in this matter, and in the course and scope of my duties, I have reviewed the books and records of USSIC that, among other things, include the above-referenced Policy issued to New Orleans Equity, LLC for the period December 8, 2019 to December 8, 2020 and the May 7, 2020 report by Johnstone Partners.  These documents, information, and materials are part of the business records of USSIC and are prepared and maintained in the ordinary course of business and as part of the regular

**EXHIBIT
1**

practice of that business activity. A true and correct copy of the Policy is attached hereto

as Exhibit A and the May 7, 2020 Johnstone Partners' report as Exhibit B.

3.      The Policy contains the following Insuring Agreements:

**1.  INSURED EVENTS**

The *Insurer* will reimburse the *Insured* for its Loss in excess of the Deductible, but not exceeding the limits or sub-limits of liability stated in the Declarations, caused by or resulting from any of the following *Insured Events* first discovered during the Policy Period and reported to the *Insurer,* in accordance with **6.20** Notice of an Incident, during the Policy Period or up to forty eight (48) hours after expiration of the Policy Period, provided that as of inception of this insurance the *Insured* was not aware and could not reasonably have been aware of circumstances which could lead to a potential claim or loss under this Policy of insurance.

**1.1. ACCIDENTAL CONTAMINATION**

Any accidental or unintentional contamination, impairment or mislabeling of an *Insured Product(s),* which occurs during or as a result of its production, preparation, manufacture, packaging or distribution – provided that the use or consumption of such *Insured Product(s)* has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use.[1]

\* \* \*

4.      The Policy defines Loss, in pertinent part, as:

**2.  LOSS**

Loss under this Policy includes only the following reasonable and necessary expenses or costs incurred by the *Insured* directly and solely as the result of a covered *Insured Event* at any insured *Location* and subject to the limits of liability of each *Insured Event.*  Except as otherwise provided with respect to Business Interruption and *Extortion Costs*, Loss is limited to expenses or costs incurred within twelve (12) months after the *Insured Event* first became known to the *Insured.*  In no event will any amounts claimed and paid under one *Insured Event* be recoverable under another *Insured Event.*

\* \* \*

---

[1] Exhibit A at USSIC_00005.

**2.1 INCIDENT EXPENSES**

    **i.**   Reasonable Fees and Expenses for the firm(s) and/or other advisor named in **Item 14** of the Declarations in responding to an *Insured Event*. The Deductible will not apply to such firm(s) in responding to an incident that may lead to an *Insured Event*.

    **ii.**  Chemical analysis and/or physical examination in order to ascertain whether the *Insured Product(s)* have been contaminated and/or to ascertain the potential effect of Malicious Tampering, Accidental Contamination or *Products Extortion.*

<div align="center">* * *</div>

**2.3 BUSINESS INTERRUPTION**

*Loss of Gross Revenue* and *Extra Expense* provided that the *Insured* continues to incur such losses beyond the *Waiting Period.*

**2.4 REHABILITATION EXPENSES**

Reasonable and necessary expenses actually incurred directly by the *Insured* as a direct result of an *Insured Event* to re-establish the *Insured's Product(s)* to the reasonably projected level of sales or market share anticipated prior to the *Insured Event*. Rehabilitation Expense is limited to expenses incurred within twelve (12) months after the *Insured Event* first became known to the *Insured.*

<div align="center">* * *</div>

**2.5 CONSULTANT AND ADVISOR COSTS**

Fees and costs of the firm(s) and/or other advisor named in Item **14** of the Declarations; and or other independent security or public relations consultants or advisors hired to assist the *Insured* in responding to an *Insured Event*, provided that the *Insurer* has given its prior consent to the use of such independent companies. Theis section has no maximum limit. The stated Policy Deductible will not apply to these expenses. [2]

<div align="center">* * *</div>

5.    The Policy defines *Insured Product(s)* as:

    **3.11**   **INSURED PRODUCT(S)** means all ingestible products for human consumption, or any of their ingredients or components, that have been

---

[2] Exhibit A at USSIC_00006.

reported to the *Insurer* on the application on file with the *Insurer* for the effective dates of this Policy or by addendum to such application and that are:

**a.** in production; or
**b.** have been manufactured, handled or distributed by the *Insured;* or
**c.** manufactured by any contract manufacturer for the *Insured;* or
**d.** being prepared for or are available for sale; or
**e.** all ingestible products for human consumption served at any restaurant location operating under the same trade name as the *Insured.* [3]

6.    The Policy contains the following Notice provisions:

**6.20    NOTICE OF AN INCIDENT**

It is a condition of recovery under this Policy that upon discovery of a potential or actual event or incident which may give rise to an *Insured Event* that the *Insured* will make every reasonable effort to:

**(i)** First, within 48 hours contact the **24-hour Crisis Line (as per notification procedures included herein**); and, having given verbal notice under
**(ii)** Determine whether an *Insured Event* has actually occurred.

**NOTICE OF AN INCIDENT** does not constitute **NOTICE OF A CLAIM** and does not satisfy the **NOTICE OF A CLAIM** requirements set forth in Section **6.21** herein.

**6.21    NOTICE OF A CLAIM**

It is a condition of recovery under this Policy that upon determination that an *Insured Event* has actually occurred under Section **6.20** above, the *Insured* shall give written notice to the *Insurer (as per notification procedures included herein)* within five (5) days of a director or officer of the *Insured* becoming aware of an *Insured Event* with periodic and timely updates concurrent with activity occurring during the incident; and if it appears to be in the best interest of the *Insured* or to be required by law, notify law enforcement authorities or any other governmental agencies having jurisdiction over the matter.

<u>**NOTICES**</u>:   Except as indicated to the contrary herein, all notices, applications, demands or requests provided for in this Policy will be in

---

[3] Exhibit A at USSIC_00009-10.

writing and will be given to or made upon the Named *Insured* at the mailing address shown in Item **1** on the Policy Declarations Page. [4]

7.      The Policy contains the following Exclusions:

   **4.** **<u>EXCLUSIONS</u>**

   This Policy of Insurance does not apply to any Loss arising out of, based upon, attributable to or consisting of, directly or indirectly:

   * * *

   **4.3** Changes in population, customer tastes, economic conditions, seasonal sales variations, or competitive environment.

   * * *

   **4.12** Any Accidental Contamination that occurs after the *Insured* has actual or constructive knowledge of a defect or deviation in the production, preparation or manufacture of *Insured Product(s),* or circumstance(s) which have or are likely to result in such deviation or defect, and fails to take reasonable corrective action.

   **4.13** Any Loss arising out of a change in governmental or health authority regulations with respect to the safety of any *Insured Product(s)* or intended ingredients. [5]

   * * *

8.      New Orleans Equity not identified any *Insured Product(s)* it claims was contaminated and has provided no evidence of actual contamination of any *Insured Product(s)*; the manner in which any *Insured Product(s)* were allegedly contaminated (e.g., as a result of the production, preparation, manufacture, packaging or distribution of the *Insured Product(s);* that any employees and/or guests contracted COVID-19 as a result of the use or consumption of *Insured Product(s);* that it complied with the Notice provisions of the

---

[4] Exhibit A at USSIC_000017.
[5] Exhibit A at USSIC_000012.

Policy; or that it suffered a Loss directly and solely as a result of the alleged Accidental Contamination.

9.   USSIC does not have complete information or evidence at this time to fully oppose the Motion for Summary Judgment filed by New Orleans Equity.  Additional discovery is needed regarding which *Insured Product(s),* if any, were allegedly contaminated; the manner of the alleged contamination, including whether during or as a result of the production, preparation, manufacture, packaging, or distribution of the allegedly contaminated *Insured Product(s)*; any employees and/or guests that allegedly contracted COVID-19 and how it was contracted; the time frame in which any employees and/or guests contracted COVID-19; actions taken by New Orleans Equity in response to any alleged contamination; actions taken by New Orleans Equity, if any, to notify the 24-Hour Crisis Line, as required by the Insuring Agreement and **6.20 NOTICE OF INCIDENT**; actions taken by New Orleans Equity in response to the Governor's Proclamations closing and/or limiting its operations; the effect of the change in market conditions/customer demand on plaintiff's business; the effect of the Governor's Proclamations on plaintiff's business; whether a Loss, as defined by the Policy, was sustained; and if such a Loss was sustained, the extent of such Loss.

10.   USSIC does not have complete information or evidence at this time to fully oppose the Motion for Summary Judgment filed by New Orleans Equity.  Expert consultation and testimony is needed to address many issues that affect coverage, including, but not limited to, whether SARS-CoV-2 and/or COVID-19 particles can contaminate food products that fall within the definition of *Insured Product(s)*; if there is contamination, whether consumption of such products would result in physical symptoms of sickness; if there is

contamination and it is possible that it would result in physical symptoms of sickness, the level of contamination required to result in physical symptoms of sickness; the statistical likelihood of such contamination causing physical symptoms of sickness; whether there actually was any contamination of the *Insured Product(s);* and whether there was any Loss directly and solely caused by an *Insured Event.*

11.    USSIC's investigation revealed that the insured's business had begun to slow down in early March due to cancellations of conferences and conventions because of the COVID-19 pandemic.   The investigation further revealed that on or about March 17, 2020, the Governor of Louisiana and the Mayor of New Orleans issued proclamations prohibiting restaurants to continue to offer on-premises dining, which conditions continued into June 2020 and which affected the insured's business operations.[6]

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on October 13, 2020

SKYE MILES

---

[6] *See* Johnstone Partners report dated May 7, 2020, attached as Exhibit B.



# U.S. SPECIALTY INSURANCE COMPANY

A Stock Company
Home Office: 13403 Northwest Freeway
Houston, Texas 77040

YOUR INSURANCE POLICY

From

**Professional Indemnity Agency, Inc. dba
Tokio Marine HCC – Specialty Group**

37 Radio Circle Drive, Mount Kisco, NY 10549

**THIS POLICY CONSISTS OF:**

**- DECLARATIONS
- COMMON POLICY CONDITIONS (WHERE APPLICABLE)
- ONE OR MORE COVERAGE PARTS.  A COVERAGE PART CONSISTS OF:**

- **ONE OR MORE COVERAGE FORMS**
- **APPLICABLE FORMS AND ENDORSEMENTS**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by
state law, this policy shall not be valid unless countersigned by our authorized representative.

BY: _____

**Michael J. Schell**
**PRESIDENT AND CEO**

_____

**Alexander Ludlow**
SECRETARY

<span style="background-color:yellow">**EXHIBIT
A**</span>

PJ 01 LA 04 17

USSIC_00001

# U.S. SPECIALTY INSURANCE COMPANY
## 13403 NORTHWEST FREEWAY
## HOUSTON, TX 77040
## RESTAURANT RECOVERY INSURANCE
## COMMON POLICY DECLARATIONS

**Broker Number:**   1941

**Policy Number:**   U719-860418

**Renewal of:**   U718-860220

| | | |
|---|---|---|
| 1. | **Insured Name(s) and Address:** | New Orleans Equity, LLC<br>209 BOURBON STREET<br>NEW ORLEANS, LA  70130 |
| | **Insured Trade Name(s):** | Galatoire's Restaurant; Galatoire's 33 Bar & Steakhouse |
| 2. | **Policy Period:** | From:  December 8, 2019  To:  December 8, 2020<br>At 12:01 a.m. Standard Time at mailing address of the named Insured above. |
| 3. | **Location(s) to be Insured:** | **2** at inception of this policy. And as per the attached Schedule of Covered Locations Form RRI 1004 - endorsement No 002 |

4.   **Limits of Liability:**

| Coverage | Each Insured Event | Aggregate Limit |
|---|---|---|
| **Section 1.1 - Accidental Contamination and Section 1.2 Malicious Tampering** | **USD 2,000,000** | **USD 2,000,000** |
| **Section 1.3 - Product Extortion** | **USD 2,000,000** | **USD 2,000,000** |
| **Section 1.4 - Adverse Publicity** | **USD   500,000** | **USD   500,000** |
| **Policy Period Aggregate Limit (Overall aggregate irrespective of the number of Insured Events and related Consultants Fees)** | **USD 2,000,000** | |

| | | | | |
|---|---|---|---|---|
| **5.** | **a) Deductible:** | **USD** | **0** | Per *Insured Event.* Does not apply to any Consultant Fees**.** |
| | **b) Waiting Period:** | | **5 Days** | Loss of Gross Revenue for a period in excess of **(5 Days)** at each single affected Restaurant Location. |

USSIC_00002

# U.S. SPECIALTY INSURANCE COMPANY
## 13403 NORTHWEST FREEWAY
## HOUSTON, TX 77040
## RESTAURANT RECOVERY INSURANCE
## COMMON POLICY DECLARATIONS

**Broker Number:**   1941

**Policy Number:**   U719-860418

**Renewal of:**   U718-860220

6.   **Co-insurance:**   **0.00%**

7.   **Premium:**   USD   ███████
    **Workplace Violence:**   USD   █████   - as per attached endorsement No 003
    **TRIA @ 5.00%:**   USD   ██████   - as per attached endorsement No 001
    ------------------------------
    **Total Premium:**   USD   ███████

8.   **Policy Territory:**   Worldwide

9.   **Insured's Products:**   All retail restaurant offerings served during the Policy period at any time at any of the Insured's Locations in the manner prescribed in the Application form signed and dated December 18, 2019  and held on file with the Insurer.

10.   **Recall Costs:**   Sub-limited to   **25.00%**  of the limit in Section 1.1 and 1.2

11.   **Rehabilitation Expenses:**   Sub-limited to   **25.00%**  of the limit in Section 1.1 and 1.2

12.   **Supplier Contamination:**   Sub-limited to **USD  500,000**   per *Insured Event* and in the annual Aggregate.

13   **Loss of Gross Revenue:**   Limited to **12 Months**.

14.   **Consultant and Advisor:**   **The Acheson Group (TAG)**

Any Sub-limit stated above does not increase the Limit of Liability as stated in section 4.

USSIC_00003

## **What to do in a crisis?**

## **Notification procedures**

In the event of an incident that may be covered under the terms of the Policy, please contact the **24-hour Crisis Line** within 48 hours (as per notification procedures 6.20)

**24-hour Crisis Line**
**800 836 5826**

**(Backup Number - 602 332 3586)**

Our panel of consultants, who are available 24 hours a day 7 days a week on a priority basis, are:

**The Acheson Group,** to respond on food borne illness and contamination issues.

### **How to make a claim**

Please provide formal written notice of loss (as per claim notification procedures 6.21) to:

Danielle Bouchard — dbouchard@hcc.com
HCC Specialty
37 Radio Circle Drive, Mount Kisco, New York, 10549, USA

***NOTIFICATION OF A CLAIM OR CIRCUMSTANCE TO THE 24-HOUR CRISIS LINE DOES NOT CONSTITUTE A CLAIM OR NOTICE OF A CLAIM UNDER THE CERTIFICATE.***

***THE ROLE OF CRISIS CONSULTANTS IS LIMITED TO PROVIDING IMMEDIATE ASSISTANCE AND GUIDANCE TO THE ASSURED IN THE EVENT OF AN ACTUAL OR THREATENED INSURED EVENT. CONSULTANTS DO NOT HAVE THE AUTHORITY ON BEHALF OF UNDERWRITERS TO ADDRESS, BIND, ACKNOWLEDGE OR AGREE TO MATTERS OF COVERAGE OR THE APPLICATION OF CERTIFICATE TERMS AND CONDITIONS.***

U719-860418

# U.S. SPECIALTY INSURANCE COMPANY
## RESTAURANT RECOVERY INSURANCE POLICY FORM

In consideration of the premium paid and in reliance on the representations made by the *Insured* in the application for this insurance, which is incorporated into and forms a part of this Policy. *Words or phrases that appear in italics are defined.*

U.S. Specialty Insurance Company herein called the *Insurer* agrees as follows:

## 1.  INSURED EVENTS

The *Insurer* will reimburse the *Insured* for its Loss in excess of the Deductible, but not exceeding the limits or sub-limits of liability stated in the Declarations, caused by or resulting from any of the following *Insured Events* first discovered during the Policy Period and reported to the *Insurer,* in accordance with **6.20** Notice of an Incident, during the  Policy Period or up to forty eight (48) hours after expiration of the Policy Period, provided that as of inception of this insurance the *Insured* was not aware and could not reasonably have been aware of circumstances which could lead to a potential claim or loss under this Policy of insurance.

### 1.1  ACCIDENTAL CONTAMINATION

Any accidental or unintentional contamination, impairment or mislabeling of an *Insured Product(s),* which occurs during or as a result of its production, preparation, manufacture, packaging or distribution -- provided that the use or consumption of such *Insured Product(s* has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use.

### 1.2  MALICIOUS TAMPERING

Any actual, alleged or threatened intentional, malicious, and wrongful alteration or contamination of the *Insured's Product(s),*whether or not by an employee of the *Insured,* so as to render it unfit or dangerous for its intended use or consumption or to create such an impression with the public.

For the purposes of this clause and any applicable exclusions, "malicious" means; "circumstances where there is clear evidence that the person(s) committing the act or threat to alter or contaminate the *Insured Product(s)* has an intention to cause loss or damage to the *Insured* or *Insured Product(s),* or where a person or persons use any such *Insured Product(s)* as a means to attempt to cause or actually cause bodily injury or property damage".

### 1.3  PRODUCT EXTORTION

Any threat or connected series of threats to commit a Malicious Tampering, for the purpose of demanding *Extortion Monies,* communicated to the *Insured.*

### 1.4  ADVERSE PUBLICITY

Any *Adverse Publicity* which is subsequently found to be baseless by reason of the absence of any physical evidence from any source whatsoever, that an Accidental Contamination (as per Section **1.1** above) has occurred.

For the avoidance of doubt, the *Insured* shall not be able to recover for *Adverse Publicity* under this Section (**1.4**) in circumstances where its Loss is within the scope of coverage provided by Section **1.1** Accidental Contamination.

USSIC_00005

## 2.  LOSS

Loss under this Policy includes only the following reasonable and necessary expenses or costs incurred by the *Insured* directly and solely as the result of a covered *Insured Event* at any insured *Location* and subject to the limits of liability of each *Insured Event*. Except as otherwise provided with respect to Business Interruption and *Extortion Costs*, Loss is limited to expenses or costs incurred within twelve (12) months after the *Insured Event* first became known to the *Insured*. In no event will any amounts claimed and paid under one *Insured Event* be recoverable under another *Insured Event*.

For the avoidance of doubt and subject to the terms and conditions of this Policy, once the *Insured* has established that Accidental Contamination as defined in Section **1.1** has occurred, any Loss caused by or resulting from *Adverse Publicity* directly linked to that Accidental Contamination shall be recoverable as part of the Accidental Contamination Limit of Liability. Such Loss shall not be subject to the Limit of Liability applicable to Section **1.4** (*Adverse Publicity*).

### 2.1  INCIDENT EXPENSES

**i.** Reasonable Fees and Expenses for the firm(s) and / or other advisor named in **Item 14** of the Declarations in responding to an *Insured Event.* The Deductible will not apply to such firm(s) in responding to an incident that may lead to an *Insured Event*.

**ii.** Chemical analysis and / or physical examination in order to ascertain whether the *Insured Products* have been contaminated and / or to ascertain the potential effect of Malicious Tampering,  Accidental Contamination or *Products Extortion*.

### 2.2  RECALL COSTS

The Sub-limit of liability for all such *Recall Costs* will be the amount stated in Item **10.** of the Declarations.  This does not increase the Limit of Liability as stated in the Declarations nor impose any additional Deductible on the *Insured*.

### 2.3  BUSINESS INTERRUPTION

*Loss of Gross Revenue* and *Extra Expense* provided that the *Insured* continues to incur such losses beyond the *Waiting Period.*

### 2.4  REHABILITATION EXPENSE

Reasonable and necessary expenses actually incurred directly by the *Insured* as a direct result of an *Insured Event* to re-establish the *Insured's Product(s)* to the reasonably projected level of sales or market share anticipated prior to the *Insured Event.* Rehabilitation Expense is limited to expenses incurred within twelve (12) months after the *Insured Event* first became known to the *Insured*

The Sub-limit of liability for all such *Rehabilitation Expense* will be the amount stated in Item **11.** of the Declarations.  This does not increase the Limit of Liability as stated in the Declarations nor impose any additional Deductible on the *Insured*.

### 2.5  CONSULTANT AND ADVISOR COSTS

Fees and costs of the firm(s) and / or other advisor named in Item **14.** of the Declarations; and or other independent security or public relations consultants or advisors hired to assist the *Insured* in responding to an *Insured Event*, provided that the *Insurer* has given its prior consent to the use of such independent companies.  This section has no maximum limit.  The stated Policy Deductible will not apply to these expenses.

**2.6   EXTORTION COSTS**

*Extortion Costs* paid in response to a demand made upon the *Insured* under threat to commit a Malicious Tampering.

**3.   DEFINITIONS**

**3.1   ADVERSE PUBLICITY** means the reporting of an actual or alleged Accidental Contamination during the Policy period in local, regional or national media (including but not limited to radio, television, newspaper, magazines or the Internet) or any governmental publication provided that the *Insured Product(s)* or the products served at any restaurant under the same trade name as the *Insured* are specifically named.

**3.2   COMPUTATION OF LOSS.**

   **a)**   In the event of any insured losses, detailed claims for payment by the *Insurer* shall be made by the *Insured* as soon as practicable and shall be accompanied by a computation of loss, which sets out in detail how the loss has been calculated and what assumptions have been made.   The *Insured* shall produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of the same which *Insurer* or their representatives, including forensic accountants, may require, and the *Insured* shall afford them every  assistance in their investigations including reasonable access to the *Insured* premises, personnel and necessary documents for the purpose of the computation of loss.

   **b)**   The *Insurer* shall determine the amount of any insured losses, less Deductible, taking into account any savings or recoveries or offsetting or make-up of losses which have been made or which the *Insured* could reasonably have been expected to make, and the ability of the *Insured* to resume operations.

   **c)**   *Loss of Gross Revenue* shall be assessed by the *Insurer* based on an analysis of the restaurant sales of affected *Insured Products*, and other *Insured Products* which lost sales as a direct result of the *Insured Event*, during each month of the twelve months prior to the *Insured Event***,** and taking into account:

      **i)**   the reasonable projection of the future profitability of such product(s) had no *Insured Event* occurred; and

      **ii)**   all material changes in market conditions of any nature whatsoever which would have affected the future marketing of and profits generated by the *Insured Products* or other affected *Insured Products*

   **d)**   In determining the amount of any insured losses *Insurers* shall apply standard accounting principles as recognized by the relevant regulatory authorities in the *Insured's* jurisdiction. Where an *Insured* is present in more than one jurisdiction the relevant principles to be applied will be those of the jurisdiction in which the entity that has suffered the loss is based.

   **e)**   Whether or not any partial payments have been made, a final statement of loss with respect to all items of Loss other than *Loss of Gross Revenue* must be submitted to the *Insurer* in writing no earlier than twelve (12) months and no later than twenty four (24) months after an *Insured Event* first becomes known to the *Insured*.   A final statement of loss with respect to *Loss of Gross Revenue* must be submitted no later than twenty four (24) months after the beginning of a reduction in sales of the *Insured Product(s)* caused by an *Insured Event*.

Nothing in this clause shall be deemed to override the provisions of the Notice of Incident or the Notice of Claims clauses.

U719-860418

**3.3    CORPORATE ACT OF THE INSURED** means any deliberate activity including but not limited to any dishonest, willful, illegal, fraudulent, criminal or malicious act, which has been expressly or implicitly approved, condoned, ratified or endorsed by any two or more members of the *Insured's* Management and which results directly or indirectly in an *Insured Event* or Loss.

**(a)**  For the purpose of any activity which constitutes a *Corporate Act of the Insured*, *Insured's* Management means the *Insured's* past or present Chairman, Chief Executive Officer, President, Managing Director, any executive or non-executive Director of the *Insured* and any person who holds or has held an equivalent position or who has or had authority to make decisions about the operation or management of the *Insured's* business on behalf of the *Insured*.

**(b)**  For the purpose of any other reference to the *Insured's* Management herein, *Insured's* Management means in addition to those named in Definition **(a)** above any Department or Division of the *Insured* which shall include but not be limited to, any legal, compliance, risk management, internal audit or insurance Department or Division.

**3.4    EXTORTION COSTS**

**(i)**  *Extortion Monies* paid by the *Insured* as a direct result of a Product Extortion discovered during the Policy Period.

**(ii)**  In transit/delivery loss due to the destruction, disappearance, confiscation or wrongful appropriation of *Extortion Monies* while being handled or conveyed by anyone who is authorized by the *Insured* to have custody thereof; provided, however, that the Product Extortion which gave rise to the delivery is insured hereunder.

**(iii)**  Extortion expenses, which include any expenses incurred and paid by the *Insured* solely as a direct result of a Product Extortion provided that such Product Extortion is insured hereunder, including but not limited to:

**a.**  the amount paid by the *Insured* as a *Reward* to an *Informant* for information relevant to an *Insured Event*;

**b.**  interest costs for a loan from a financial institution made to the *Insured* for the purpose of paying *Extortion Monies*;

**c.**  costs of travel and accommodations incurred by or on behalf of the *Insured* while attempting to negotiate a Product Extortion;

**d.**  medical services and hospitalization costs incurred by any person(s) directly involved in the handling or negotiating of a Product Extortion and/or the handling of *Extortion Monies*, and paid by the *Insured* as the direct result of a Product Extortion within thirty six (36) months following the last credible extortion threat discovered during the Policy period, including but not limited to any costs for treatment by a neurologist or psychiatrist, costs for cosmetic surgery, and expense of confinement for such treatment;

**e.**  fees and expenses of independent forensic analysts engaged by the *Insured*;

**f.**  fees and expenses of a qualified interpreter assisting the *Insured* in connection with a Product Extortion;

USSIC_00008

**g.** increased costs of security due to a Product Extortion including but not limited to hiring of security guards, hiring of armored vehicles, and overtime pay to existing security staff for a period of up to ninety (90) days, provided however that the firm(s) and / or other advisor named in **Item 14.** of the Declarations or other specialist consultant approved by the *Insurer* in writing has specifically recommended such security measures.

**3.5    EXTORTION MONIES m**eans any monies which the *Insured* has paid or lost in transit under circumstances described in *Insured Event*, Section **1.3**.  The term monies – as used herein – include cash, monetary instruments, bullion, or the fair market value of any securities, property or services.

**3.6    EXTRA EXPENSE m**eans the excess of the total cost of conducting business activities during the period of time necessary to clean or repair the *Location* (owned or operated by the *Insured*) where the incident occurred for the sole purpose of reducing the Loss.  This Policy only covers those extra expenses which are over and above the cost of such activities during the same period of time had no incident occurred.  This may include but is not limited to the following:

**(i)**    The *Extra Expense* necessary to clean the machinery or *Location* involved in the contamination or handling of the contaminated product in order to recreate an environment in which safe products can be manufactured or handled.

**(ii)**   The *Extra Expense* that may be required to maintain the salaries of the workforce to the extent required by statute or union or other work contract for a maximum period of six (6) months.

**(iii)**  The cost to maintain a minimum work force at a minimal percentage of salary in order to be able to open the location without delay as soon as possible after a shutdown imposed by the Health, Safety, and Environmental (HSE) or Health Authority or other national or local governmental organization or body.

**(iv)**   The increased cost of subcontracting some or all of the manufacturing process to a contract manufacturer for a period of time necessary to restore the *Insured's* facilities to a state in which products can be manufactured or handled safely.

**(v)**    The expense of preventative inoculations, initial series vaccination and current testing for the *Insured's* employees or customers as a result of an *Insured event* at an *Insured's Location*.

**3.7    INFORMANT** means any person, other than an *Insured* person(s), providing information not otherwise obtainable, in return for a *Reward* offered by the *Insured*.

**3.8    INSURED** means the sole proprietorship, partnership, or corporation stated in Item 1 of the Declarations.

**3.9    INSURED EVENT:** as per Section **1** and as defined under Sections **1.1**, **1.2**, **1.3** and **1.4**.

**3.10   INSURER** U. S. Specialty Insurance Company

**3.11   INSURED PRODUCT(S)** means all ingestible products for human consumption, or any of their ingredients or components, that have been reported to the *Insurer* on the application on file with the *Insurer* for the effective dates of this  Policy or by addendum to such application and that are:

**a.** in production; or
**b.** have been manufactured, handled or distributed by the *Insured*; or
**c.** manufactured by any contract manufacturer for the *Insured*; or

   **d.**  being prepared for or are available for sale; or

   **e.**  all ingestible products for human consumption served at any restaurant location operating under the same trade name as the *Insured.*

**3.12**   **LOCATION** shall mean the place or places of business of the *Insured* as reported to the *Insurer* on the application on file with the *Insurer* for the effective dates of this Policy, or subsequent new locations from *Organic Growth*, or acquisitions as per Section **6.2**, and where such locations' Loss of Gross Profit is negatively impacted directly and solely as a result of an *Insured Event.*

**3.13**   **LOSS OF GROSS REVENUE** means:

   **a)**  the *Insured's* sales revenue as could have been reasonably projected immediately prior to the happening of an *Insured Event*, but which has been lost during a period not exceeding the number of months as stated in Item **13.** of the Declarations from the date of an *Insured Event* solely and directly as a result of that *Insured Event*, LESS:

   **b)**  the variable costs that would have been incurred during the same period, but which have been saved as a result of not making those sales (including the cost of raw materials, and all other saved costs).

If during such period the *Loss of Gross Revenue* of the *Insured Product(s)* is offset by increased sales of another *Insured Product(s* within the same product line as the affected product(s) claimed in the loss as a result of an *Insured Event* such offset will be considered to reduce the actual loss sustained.

Any *Loss of Gross Revenue* shall be computed in accordance with Section **3.2** C*omputation of Loss*

**3.14**   **RECALL COSTS** means any reasonable and necessary costs incurred by the *Insured* to inspect, withdraw, destroy or replace such affected *Insured Product(s).  Recall Costs* also include but are not limited to:

   **(i)**  The cost of newspaper, magazine or any printed advertising, radio and television announcements or commercials, as well as the cost of correspondence, necessary to effect the recall.

   **(ii)**  Essential transportation and accommodation costs directly attributable to the recall.

   **(iii)**  The cost of hiring additional person(s), other than regular employees of the *Insured*, devoted exclusively to effect the recall of the *Insured Product(s).*

   **(iv)**  Overtime paid to regular employees of the *Insured* for work devoted exclusively to the recall.

   **(v)**  The necessary out-of-pocket expenses of personnel under paragraphs **(iii)** and **(iv)** above, including transportation, incurred exclusively for the purpose of such recall.

   **(vi)**  Expense of renting or hiring additional warehouse or storage space for the recall for a maximum period of twelve (12) months.

   **(vii)**  Expense incurred in properly disposing of the unused packaging and point of purchase marketing material of recalled product if it cannot be used or reused.

   **(viii)**  Inspection costs including the costs of chemical analysis or other such efforts to identify the cause(s) or potential effect of contamination.

USSIC_00010

U719-860418

**(ix)** The actual cost of redistributing any recalled or restored product(s).

**(x)** Cancellation fees for any advertising and/or promotion programs, which were scheduled but were unable to be executed solely because of an *Insured Event.*

**(xi)** The cost of restoring the *Insured Product(s)* to merchantable quality or replacing any recalled *Insured Product(s)* that have been destroyed, are unsellable or are unfit for its original use, with product(s) of similar value.

**3.15** **REHABILITATION EXPENSE** means the reasonable and necessary expenses incurred directly by the *Insured* as a direct result of an *Insured Event* to re-establish the *Insured's Product(s)* to the reasonably projected level of sales or market share anticipated prior to the *Insured Event.* Rehabilitation Expense is limited to expenses incurred within twelve (12) months after the *Insured Event* first became known to the *Insured.*

**3.16** **REWARD** means monies offered for information in an effort to mitigate the Loss.

**3.17** **SUB-LIMIT** means the maximum amount the *Insured* can collect under a specified section of this Policy.

**3.18** **SUPPLIER CONTAMINATION** means Accidental Contamination *or* Malicious Tampering of ingredients or product(s) supplied to the *Insured.* The aforementioned ingredients or products include any such ingredients or products supplied to the *Insured* from an entity owned or operated by the *Insured.*

**3.19** **ACT OF TERRORISM** means an act of actual, alleged or threatened, intentional, malicious and wrongful alteration or contamination of any product(s), not limited to *Insured Product(s)*, by an individual or group whose announced or apparent objective is to further purported political, social, and/or religious beliefs, and which is intended to:

**1)** put the public at large, or a section of the public, in fear; or

**2)** coerce or intimidate a government or individuals to modify their behavior or policies.

**3.20** **WAITING PERIOD** means the number of consecutive days stated in the Declarations for which the *Insured* must incur *Loss of Gross Revenue* and/or *Extra Expense* at a *Location* before such losses in respect of that *Location* are covered by this Policy.

**3.21** **ORGANIC GROWTH** means that coverage is automatically provided to new restaurant locations added after the Policy Period date at no additional premium provided such new location(s) were not declared by the *Insured* within thirty (30) days of the policy effective date. The additional location(s) shall be covered at no additional premium for the remaining Policy period. New location(s) to be added within thirty (30) days of the effective date of the policy shall be charged a pro-rated premium calculated at a rate of 1/365ths per day of the annual per location premium from the date of inclusion in the Policy to the remaining Policy Term.

**4.** <u>**EXCLUSIONS**</u>

This Policy of Insurance does not apply to any Loss arising out of, based upon, attributable to or consisting of, directly or indirectly:

**4.1** Any Accidental Contamination or Malicious Tampering of a product of a competitor apart from those products served at a location with the same trade name as the *Insured.*

**4.2** Any Accidental Contamination involving gradual deterioration, decomposition, or transformation of the chemical structure of the *Insured Product(s)*, or *Adverse Publicity* (or any publicity whatsoever) implying such, unless such deterioration, decomposition,

USSIC_00011

or transformation is a result of a sudden, identifiable event occurring at a specific time and location during the Policy period or was not likely to have been discovered by the *Insured* following its standard operating procedures.

**4.3**   Changes in population, customer tastes, economic conditions, seasonal sales variations, or competitive environment.

**4.4**   Any *Corporate Act of the Insured*

**4.5**   Any injury, damage, or claim made by a third party arising out of or in connection with the use or consumption of the *Insured Product(s)*. Costs or expenses of any litigation or any proceedings before any governmental body as a result of an *Insured Event* or otherwise. This includes any defense costs related to a third party lawsuit.

**4.6**   Intentional violation by the *Insured* of any governmental regulation in connection with the manufacture, sale, or distribution of any *Insured Product(s)* or from the use of materials or substances in the manufacturing process which have been banned or declared unsafe by any governmental entity.

**4.7**   Nuclear reaction or nuclear radiation or radioactive contamination (except a radioactive tampering specifically aimed at the *Insured Product(s*), all whether controlled or uncontrolled, or resulting from any act or condition incident to any of the foregoing, whether such Loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by an *Insured Event* or otherwise.

**4.8**   Any proximate or remote consequence, whether direct or indirect, of war, invasion, hostilities (whether war declared or not), civil war, rebellion, revolution, insurrection, or military or usurped power.

**4.9**   Failure by any consumer of the product other than the *Insured* to adhere to procedures prescribed by the *Insured* regarding the storage, consumption, or use of an *Insured Product(s)*. This exclusion only applies to *Insured Event Section* **1.1** - Accidental Contamination.

**4.10**   Any Accidental Contamination arising out of:

  **(i)**   Bioengineering, genetic engineering or genetic modification of any *Insured Product(s)*;
  **(ii)**   Hormone treatment of any *Insured Product(s)*;
  **(iii)**   Irradiation of any *Insured Product(s)*;
  **(iv)**   Transmissible Spongiform Encephalopathy's (TSE) including, Bovine Spongiform Encephalopathy (BSE) or Creutzfeldt-Jakob disease.

**4.11**   Any Accidental Contamination arising out of an *Insured Product* containing a carcinogen, regardless of whether such carcinogens are shown to have other non-carcinogenic effects. This exclusion shall not apply where the *Insured* can prove that such substance was not part of the *Insured Product* at the point where it was supplied to the restaurant.

**4.12**   Any Accidental Contamination that occurs after the *Insured* has actual or constructive knowledge of a defect or deviation in the production, preparation or manufacture of *Insured Product(s)*, or circumstance(s) which have or are likely to result in such deviation or defect, and fails to take reasonable corrective action.

**4.13**   Any Loss arising out of a change in governmental or health authority regulations with respect to the safety of any *Insured Product(s)* or intended ingredients.

**4.14**   An event, series of events or circumstance(s) of which an employee, officer or director of the *Insured* had actual or constructive knowledge prior to the Policy inception date.

USSIC_00012

**4.15**   An actual or alleged *Act of Terrorism*. This exclusion shall not apply where the *Insured* or an *Insured Product* is the direct target of the act or alleged *Act of Terrorism*.

**4.16**   Any compensatory damages, fines penalties, "punitive damages", exemplary or other non-compensatory damages imposed upon the *Insured* by third parties or governmental organizations/agencies. "Punitive damages" means damages that may be imposed to punish a wrongdoer and to deter others from similar conduct.

**4.17**   Any Accidental Contamination that occurs at a *Location* where at the time of the *Insured Event* no person or individual at the insured *Location* holds a recognized current Food Safety Certification where required by law or similar corporate supplied food safety training.

**4.18**   Any loss caused directly or indirectly, in whole or in part, by:

    **1.** Any form of *Avian Influenza Viruses*;

    **2.** Any actual, threatened, predicted or perceived outbreak *of Avian Influenza Viruses*; or

    **3.** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with *Avian Influenza Viruses*; or

    **4.** Any measures or actions undertaken, directed and/or recommended by any governmental or regulatory authority, or any other entity or natural person, with respect to *Avian Influenza Viruses* regardless of any other cause, event, material or product that contributed concurrently or in any sequence to or was accelerated by or results from the loss, injury, cost, damage, claim, expense, dispute and/or suit.

For the purposes of this exclusion, the term *Avian Influenza Viruses* includes:

    **a.** All avian flu or bird influenza viruses including any other nomenclature, scientific (e.g. AH5N1, AH5N2, AH7N1, A H9N2) or otherwise (e.g. "bird flu") devised or used to describe the viruses regardless of any genetic features or differences, subtype or strain, and whether or not partnered with any neuraminidase surface proteins; and any progression, mutation or recombination thereof, including but not limited to progression, mutation or recombination of any subtype or strain, and/or any changes in the antigenic composition thereof.

    **b.** Any complications, infections, illnesses, or secondary or opportunistic diseases related to, or initiating because of, or occurring in conjunction with, or following *Avian Influenza Viruses*.

**4.19**   *Adverse Publicity* generated by any of the *Insured's* directors, officers or trustees.

**4.20**   The use of any counterfeit, fraudulent, or substandard ingredient or component of an *Insured Product* supplied to the *Insured* by any other party without malicious intent. This exclusion applies to section **1.2** - Malicious Tampering only.

## 5.   PREMIUM PAYMENT TERMS

Payment to be remitted within thirty (30) days of the Policy inception date.

## 6.   GENERAL CONDITIONS

### 6.1   ACTION AGAINST THE INSURER

No suit, action, or proceedings for recovery of any claim under Policy will be sustainable in any court of law, equity, or other tribunal unless all the requirements of this Policy are

USSIC_00013

U719-860418

complied with and the same be commenced within twenty four (24) months after a final statement of loss has been submitted to the *Insurer* by the *Insured.*

**6.2   ADDITIONAL EXPOSURES**

The *Insured* will give the *Insurer* written notice as soon as practicable or permissible of any:

**(i)**   consolidation or merger with;

**(ii)**   acquisition of the majority stock ownership of; or

**(iii)**   acquisition of the assets of any other entity whose revenues are in excess of ten percent (10%) of the gross revenue of the *Insured* as of the date of consolidation, merger or acquisition.

Additional exposure such as is otherwise covered by this ‑Policy resulting from any of the above will be covered automatically from the date of consolidation, merger or acquisition, as the case may be, but only until:

**a.**   the *Insurer* notifies the *Insured* in writing of his election to reject such additional exposure;

**b.**   the *Insured* and the *Insurer* agree new terms and conditions for the permanent cover of the additional exposure; or

**c.**   ninety (90) calendar days have elapsed, whichever occurs first.

No claim arising out of the additional exposure will be covered unless the *Insured*, at the time it gave notice thereof to the *Insurer*, did not know nor could reasonably have been expected to know of the *Insured Event* giving rise to the claim.

**6.3   ASSISTANCE AND CO-OPERATION**

The *Insured* will cooperate with the *Insurer* in all matters relating to this Insurance.  This may include, but is not limited to, attending hearings and trials, securing and giving evidence, obtaining the attendance of witnesses, assisting in effecting settlements, and in conducting litigation, arbitration, or other proceedings.

**6.4   AUTHORIZATION CLAUSE**

By acceptance of this Policy, the first *Insured* listed on the Declarations agrees to act on behalf of all other *Insured's* with respect to the giving and receiving of any return premiums that may become due under this Policy, the acceptance of endorsements, and the giving or receiving of any other notice provided for in this Policy; and all other *Insured's* agree that the first *Insured* listed on the Declarations will act on their behalf.

**6.5   CALCULATION OF THE AMOUNT PAYABLE UNDER A SUB-LIMIT**

Any amount payable for Loss under the *Sub-limit* pertaining to Section **2.3** of this Policy will be calculated as follows:

First the apportioned Deductible as calculated under Section **6.25** of this Policy will be subtracted from the applicable section of loss.  Second, the applicable co-insurance will be applied to the balance.  The amount payable thereafter will be the lesser of either the *Sub-limit* or the product of the co-insurance and the balance.   No amount of loss will be paid in excess of the *Sub-limit.*

USSIC_00014

**6.6    CANCELLATION**

This Policy may be cancelled by the *Insured* by the surrender of this Policy to the *Insurer*, or by giving advance written notice to the *Insurer*, stating when thereafter such cancellation will be effective. This Policy may be cancelled by the *Insurer* by delivering to the *Insured* or by mailing to the *Insured* by registered or certified mail, at the *Insured's* Mailing address stated in Item **1** of the Declarations, written notice stating when, not less than one hundred and twenty (120) days thereafter, the cancellation will be effective, except in the case of cancellation for non-payment of premium by the *Insured*, in which case the *Insurer* will provide at least fifteen (15) days written notice. The mailing of such notice will be sufficient proof of notice and this Policy will terminate at the date and hour specified in such notice.

If this Policy is cancelled by the *Insured*, the *Insurer* will retain the short rate portion of the premium hereon, as per the terms of the NMA45 Short Rate Cancellation Clause, attached herein. If this Policy is cancelled by the *Insurer*, the *Insurer* will retain the pro-rata portion of the premium hereon.  Payment or tender of any unearned premium by the *Insurer* will not be a condition precedent to the effectiveness of cancellation, but such payment will be made as soon as practicable.

**6.7    CHANGES**

Notice to any representative of the *Insurer* or knowledge possessed by any representative or by any person will not affect a waiver or a change in any part of this Policy or stop the *Insurer* from asserting any right under the terms of this Policy, nor can the terms of this Policy be waived or changed unless agreed to in writing by an authorized representative of the *Insurer*.

**6.8    CHOICE OF LAW AND FORUM**

The construction, validity and performance of this Policy will be governed by the laws of the country or state specified for the purpose in the Declarations.  The *Insurer* and the *Insured* hereby expressly agree that all claims and disputes will be litigated in the court or courts specified for the purpose in **Item 8**. of the Declarations.

**6.9    CO-INSURANCE**

The *Insured* will bear the co-insurance amount stated in Item **6**. of the Declarations of each covered Loss in excess of, and in addition to the Deductible under *Insured Event* Section **1.1**, Accidental Contamination. The co-insurance amount will be calculated by multiplying the covered Loss in excess of the Deductible by the co-insurance amount.  The *Insurer* will pay covered Loss in excess of the Deductible subject to the Limit of Liability stated under Item **4**. of the Declarations after deduction of the co-insurance amount from the covered Loss.

**6.10    CONCEALMENT, MISREPRESENTATION, NON-DISCLOSURE, OR FRAUD**

Without prejudice to the *Insurer's* other rights, howsoever arising, this Policy is null and void in case of concealment, misrepresentation, non-disclosure, or fraud by any *Insured* of a material fact concerning:

**1.**    this insurance or the procurement thereof; or
**2.**    the *Insured Product(s),* or the *Insured's* interest in the *Insured Product(s)*; or
**3.**    any *Insured Event*, or any Loss or claim under this Policy.

**6.11    CONFIDENTIALITY**

The *Insured* will not disclose the existence of this Policy to any person or party whether within or outside the Insured except insofar as is required in order to comply with the terms of this Policy or by law.

U719-860418

**6.12    DISCOVERY PERIOD**

This Policy does not cover any Loss discovered later than forty eight (48) hours after the expiration of the Policy Period.

**6.13    DUE DILIGENCE**

The *Insured* will exercise due diligence to do all things reasonable and practical to avoid any happening or circumstances covered by this Policy and to make all reasonable efforts to mitigate any Loss arising as a result of an *Insured Event.*

**6.14    EXAMINATION UNDER OATH**

The *Insured*, as often as may reasonably be required, shall exhibit to any person designated by the *Insurer* all affected *Insured Product(s)* whether salvageable or otherwise, and shall submit to examinations under oath by any person named by the *Insurer*, and subscribe the same; and, as often as may reasonably be required, shall produce for examination all books of account, vouchers, bills, invoices, schedules, accounting information, and any documentation relating to the *Insured's* calculation of its Loss, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the *Insurer* or its representative, and shall permit extracts and copies thereof to be made.

**6.15    EXCESS INSURANCE**

The *Insured* may purchase other insurance over the Limit of Liability set forth in this Policy without prejudice to this Policy, provided that the *Insurer* is notified in writing of the details of such other excess insurance at the time such other insurance is acquired.  The existence of such other insurance, if any, will not reduce the *Insurer's* liability under this Policy.

**6.16    INSPECTION AND AUDIT**

The *Insurer* may examine and audit the *Insured's* business documents relating to the subject matter of this insurance until three (3) years after this Policy has expired or has been cancelled.  Any premium due for exposures which exist but were not reported will be determined through audit by the *Insurer*.

**6.17    LIMITS OF LIABILITY**

The *Insurer's* liability hereunder will be limited to the amounts stated in Item **4**. of the Declarations.

**6.18    NON-ACCUMULATION OF LIABILITY**

Regardless of the number of years this Policy may continue in force, and of the number of premiums which may be payable or paid, or of any other circumstances whatsoever, the aggregate liability of the *Insurer* under this Policy with respect to any *Insured Event(s)* will not be cumulative from year to year or period to period.  When there is more than one *Insured*, the aggregate Limit of Liability of the *Insurer* for Loss*(es)* sustained by any or all of them will not exceed the amount for which the *Insurer* would be liable if all Loss or losses were sustained by any one of them.

**6.19    NON-ASSIGNMENT**

This Policy may not be assigned or transferred without the written consent of the *Insurer*.

USSIC_00016

U719-860418

**6.20**     **NOTICE OF AN INCIDENT**

It is a condition of recovery under this Policy that upon discovery of a potential or actual event or incident which may give rise to an *Insured Event* that the *Insured* will make every reasonable effort to:

**(i)**     first, within 48 hours contact the **24-hour Crisis Line** *(as per notification procedures included herein)*; and, having given verbal notice under

**(i)**     determine whether an *Insured Event* has actually occurred.

**NOTICE OF AN INCIDENT** does not constitute **NOTICE OF A CLAIM** and does not satisfy the **NOTICE OF A CLAIM** requirements set forth in Section **6.21** herein.

**6.21**     **NOTICE OF A CLAIM**

It is a condition of recovery under this Policy that upon determination that an *Insured Event* has actually occurred under Section **6.20** above, the *Insured* shall give written notice to the *Insurer (as per notification procedures included herein)* within five (5) days of a director or officer of the *Insured* becoming aware of an *Insured Event* with periodic and timely updates concurrent with activity occurring during the incident; and if it appears to be in the best interest of the  *Insured* or to be required by law, notify law enforcement authorities or any other governmental agencies having jurisdiction over the matter.

**NOTICES:**  Except as indicated to the contrary herein, all notices, applications, demands or requests provided for in this Policy will be in writing and will be given to or made upon the Named *Insured* at  the mailing address shown in Item **1**. on the Policy Declarations Page.

**6.22**     **OTHER INSURANCE**

The *Insured* may purchase other insurance written on the same terms and conditions as this Policy provided the *Co-insurance* and Deductible as described in Sections **6.9** and **6.25** herein remains uninsured.  The insurance provided under this Policy will be primary in all instances except where a Kidnap and Ransom/Extortion policy is issued. The insurance will co-insure all losses where coverage is also provided by such Kidnap and Ransom/Extortion Policy or polices.

**6.23**     **RECOVERIES**

If the *Insured* shall sustain any Loss covered by this Policy, all recoveries (except from surety ship, insurance, reinsurance or indemnity taken by or for the benefit of the *Insurers*) on account of the Loss, less the actual cost of recovery, shall be distributed as follows:

The *Insured* shall be reimbursed for any Loss which exceeds the amount of coverage provided by this Policy less the Deductible amount, the balance applied to reimbursement of the *Insurers* to the extent of their Loss and any remainder paid to the *Insured*. If there is no excess Loss any such recoveries shall be distributed first in reimbursement to the *Insurers* to the extent of their Loss and any remainder paid to the *Insured*.

**6.24**     **SALVAGE**

Any salvage or other recovery, after expenses incurred in salvage or recoveries are deducted, will accrue entirely to the benefit of the *Insurer* until the sum paid by the *Insurer* has been recovered.  In case of damage to property bearing a brand or trademark, or which in any way carries or implies the guarantee or the responsibility of the *Insured*,

USSIC_00017

U719-860418

the salvage value of such damaged property will be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics, the costs of which will be borne by the *Insured*. The goodwill and public image of the *Insured* will be considered in determining whether any *Insured Product(s)* should be involved in salvage recovery. The *Insurer's* right to salvage will not be unreasonably restricted by the *Insured*. The *Insured* will have full right to the possession of all goods involved in any Loss under this Policy and will retain control of all damaged goods.  There can be no abandonment of any property to the *Insurer.*

## 6.25   DEDUCTIBLE

The Deductible(s) stated in **Item 5.a.** of the Declarations will apply separately to each and every Loss. The Deductible(s) is to be borne by the *Insured* and remain uninsured.  The *Insurer* agrees to pay the amount by which any loss exceeds the Deductible up to the Policy Limit.

## 6.26   SEVERABILITY, CONSTRUCTION AND CONFORMANCE TO STATUTE

(i)   If any provision contained in this Policy is, for any reason, held to be invalid, illegal or unenforceable in any respect, it is deemed to be severed and to have no effect on any other valid legal and enforceable provision of this Policy.

(ii)   If any provision contained in this Policy can be construed as being invalid, illegal or unenforceable for any reason, it will be construed by limiting it so as to be valid, legal, and enforceable to the extent compatible with applicable law.

(iii)   Any provisions of this Policy which are in conflict with the statutes or regulations of the state or country wherein this Policy is issued are hereby amended to conform to such statutes or regulations.

## 6.27   TERRITORY

This Policy applies to an *Insured Event* anywhere in the world:

**a.**   provided that the *Insured's* responsibility to pay damages is determined in a suit brought in the United States of America (including its territories and possessions), Puerto Rico or Canada, or in a settlement we agree to; or

**b.**   unless specifically limited by the *Insurer* through endorsement or where prohibited by applicable Law.

## 6.28   VALUATION CLAUSE

In determining the amount of Gross Revenue, *Extra Expense* and other insured loss, such adjustments shall be made as may be necessary to provide for the trend of the business and for variations in, or special circumstances affecting, the business either before or after the *Insured Event* so that the figures once adjusted shall represent as nearly as may be reasonably practicable the results, which but for the *Insured Event* would have been obtained during the period after the *Insured Event* during which the business has been affected.

## 6.29   SUBROGATION

In the event of any payment under this Policy, the *Insurer* will be subrogated to the extent of such payment to all the *Insured's* rights of recovery.  In such case the *Insured* will execute all documents required and will do everything necessary to secure and preserve such rights including the executions of such documents necessary to enable the *Insurer* effectively to bring suit in the name of the *Insured.*

USSIC_00018

**6.30     TITLES OF PARAGRAPHS**

Titles of paragraphs are inserted solely for the convenience of reference and will not limit, expand, or otherwise affect the provisions to which they relate.

**6.31     APPRAISAL**

In case the *Insured* and *Insurers* shall fail to agree as to the amount of Loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty (20) days of such demand. The appraisers shall first select a competent and disinterested umpire; and, failing for fifteen (15) days to agree upon such umpire, on request of the *Insured* or *Insurers*, such umpire shall be selected by a judge of a court of record in the applicable jurisdiction. The appraisers shall then appraise the Loss, stating separately the amount of each item comprising the Loss and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with the Company shall determine the amount of the Loss. Each appraiser shall be paid by the party selecting him, and the expenses of appraisal and umpire shall be paid by the parties equally.

**6.32     SUIT AGAINST THE COMPANY**

No suit or action on this Policy for the recovery of any Loss shall be sustainable in any Court of law or equity unless the *Insured* shall have fully complied with all requirements of this Policy and unless commenced within twenty four (24) months after the *Insured* first had knowledge of, or should have had knowledge of an *Insured Event*.

# U.S. SPECIALTY INSURANCE COMPANY
## RESTAURANT RECOVERY INSURANCE

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms part of Policy No.U719-860418

Date endorsement issued:  December 20, 2019          Endorsement number:   001

**Insured Name(s):** New Orleans Equity, LLC

## U.S. Terrorism Risk Insurance Act, as amended in 2015

## Not Purchased Clause

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act, as amended in 2015" as summarized in the disclosure notice.*

It is hereby noted that the Company has made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act, as amended in 2015" ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

.

**RRI 1008 11 16**                                                                 **Page 1 of 1**

## U.S. SPECIALTY INSURANCE COMPANY
### RESTAURANT RECOVERY INSURANCE

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms a part of Policy No. U719-860418

Date endorsement issued: December 20, 2019          Endorsement number: 002

# SCHEDULE OF COVERED LOCATIONS

**Insured Name(s):**     **New Orleans Equity, LLC**

**Trade Name(s):**      **Galatoire's Restaurant; Galatoire's 33 Bar & Steakhouse**

It is hereby understood and agreed that this Schedule of covered locations forms a part of Policy reference:-

U719-860418   Effective: December 8, 2019

| Insured Trade Name | Address | City | State | Zip Code | Total # of Locations |
|---|---|---|---|---|---|
| Galatoire's Restaurant | 209 Bourbon Street | New Orleans | Louisiana | 70130 | 2 |
| Galatoire's 33 Bar & Steakhouse | 213-215 Bourbon Street | New Orleans | Louisiana | 70130 | 2 |

**All other terms and conditions remain unchanged.**

| U.S. SPECIALTY INSURANCE COMPANY |
|:---:|
| **RESTAURANT RECOVERY INSURANCE** |

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms part of Policy No. U719-860418

Date endorsement issued:  December 20, 2019          Endorsement number: **003**


## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY


# WORKPLACE VIOLENCE

In consideration of the premium charge of **$** ▇ it is hereby agreed that Item 4., Limits of Liability on Page 1 of the Policy Declarations is amended to include the following:

**Section 1.5 Workplace Violence**

| | | |
|---|---|---|
| $ | 250,000 | **Workplace Violence Sublimit of Indemnity** per **Affected Location** |
| $ | 500,000 | Aggregate **Workplace Violence Sublimit of Indemnity** for All **Affected Locations** |
| $ | 500 | Deductible Each and Every **Workplace Violence** per **Affected Location** (not applicable to **Consultant and Advisor Costs**) |
| | 6 months | Maximum Indemnity Period |

It is further agreed that **3.9** Insured Event shall be amended to include **1.5** Workplace Violence.

Insurer's maximum liability for coverages provided by this endorsement with respect to any Single Location arising from any one incident of Workplace Violence occurring during the Policy Period shall not exceed the Workplace Violence Sublimit of Indemnity set forth in this endorsement.

Notwithstanding the provisions of Sections **1.1** through Section **1.4** in **4**., Limits of Liability on Page **1** of the Policy Declarations, the Insurer's maximum liability for coverages provided by this endorsement at all Affected Locations insured hereunder resulting from any one event of Workplace Violence shall not exceed The Aggregate Work-place Violence Sublimit of Indemnity for all Affected Locations and shall apply only to any amount in excess of any Deductible amount stated in this endorsement.

It is further agreed that, for the purposes of coverage provided by  this endorsement, "Affected Location" shall  mean: "only  the specific Location where Workplace Violence occurred."

It is further agreed that, for the purposes of coverage provided by  this endorsement, Sublimit of Indemnity means:

1. "Business Interruption", pursuant to item **2.3** under **2.** Loss; and

2. "Consultant and Advisor Costs",  pursuant to **2.5** under **2.** Loss.

| U.S. SPECIALTY INSURANCE COMPANY |
| :---: |
| **RESTAURANT RECOVERY INSURANCE** |

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms part of Policy No. U719-860418

Date endorsement issued:  December 20, 2019          Endorsement number;   003 **(continued)**


### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

# WORKPLACE VIOLENCE


It is further agreed that, for the purposes of coverage provided by this endorsement, "Workplace Violence" means:

1.   "Any intentional and unlawful act of deadly force, or threat thereof, which has resulted in, or could result in, bodily injury or death which is directed specifically against the employees, customers, vendors or facility of a Location".

It is further agreed that Item **5. B.** Waiting Period on Page **2** of the Policy Declarations shall not apply to the coverage provided by this endorsement.

It is further agreed that limits provided by this endorsement shall not operate to increase the Policy Period Aggregate Limit as shown in Item **4.** Limits of Liability on Page **1** of the Policy Declarations; furthermore, the limits provided by this endorsement shall be part of the Policy Period Aggregate as shown in Item **4.,** Limits of Liability on Page **1** of the Policy Declarations.

This endorsement shall be subject to any and all other policy Definitions, Exclusions, and General Conditions.


All other Terms and Conditions remain unchanged.

USSIC_00023

---

**U.S. SPECIALTY INSURANCE COMPANY**

**RESTAURANT RECOVERY INSURANCE**

---

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms part of Policy No. U719-860418

Date endorsement issued:  December 20, 2019                    Endorsement number: 004

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

## SHORT RATE CANCELLATION TABLE ENDORSEMENT

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Assured the Earned Premium shall be computed as follows:-

### SHORT RATE CANCELLATION TABLE

A.   For insurances written for one year:-

| Days Insurance in Force | Per cent. of One Year Premium | Days Insurance in Force | Per cent. of One Year Premium |
|---|---|---|---|
| 1 | | 154 - 156 | |
| 2 | | 157 - 160 | |
| 3 -- 4 | | 161 - 164 | |
| 5 -- 6 | | 165 - 167 | |
| 7 -- 8 | | 168 - 171 | |
| 9 - 10 | | 172 - 175 | |
| 11 - 12 | | 176 - 178 | |
| 13 - 14 | | 179 - 182 | (6 months) |
| 15 - 16 | | 183 - 187 | |
| 17 - 18 | | 188 - 191 | |
| 19 - 20 | | 192 - 196 | |
| 21 - 22 | | 197 - 200 | |
| 23 - 25 | | 201 - 205 | |
| 26 - 29 | | 206 - 209 | |
| 30 - 32 | (1 month) | 210 - 214 | (7 months) |
| 33 - 36 | | 215 - 218 | |
| 37 - 40 | | 219 - 223 | |
| 41 - 43 | | 224 - 228 | |
| 44 - 47 | | 229 - 232 | |
| 48 - 51 | | 233 - 237 | |
| 52 - 54 | | 238 - 241 | |
| 55 - 58 | | 242 - 246 | (8 months) |
| 59 - 62 | (2 months) | 247 - 250 | |
| 63 - 65 | | 251 - 255 | |
| 66 - 69 | | 256 - 260 | |
| 70 - 73 | | 261 - 264 | |
| 74 - 76 | | 265 - 269 | |
| 77 - 80 | | 270 - 273 | (9 months) |

| | | | |
|---|---|---|---|
| 81 - 83 | .................................. | 274 - 278 | .................................. |
| 84 - 87 | .................................. | 279 - 282 | .................................. |
| 88 - 91 | (3 months) ...................... | 283 - 287 | .................................. |
| 92 - 94 | .................................. | 288 - 291 | .................................. |
| 95 - 98 | .................................. | 292 - 296 | .................................. |
| 99 - 102 | .................................. | 297 - 301 | .................................. |
| 103 - 105 | .................................. | 302 - 305 | (10 months) ..................... |
| 106 - 109 | .................................. | 306 - 310 | .................................. |
| 110 - 113 | .................................. | 311 - 314 | .................................. |
| 114 - 116 | .................................. | 315 - 319 | .................................. |
| 117 - 120 | .................................. | 320 - 323 | .................................. |
| 121 - 124 | (4 months) ...................... | 324 - 328 | .................................. |
| 125 - 127 | .................................. | 329 - 332 | .................................. |
| 128 - 131 | .................................. | 333 - 337 | (11 months) ..................... |
| 132 - 135 | .................................. | 338 - 342 | .................................. |
| 136 - 138 | .................................. | 343 - 346 | .................................. |
| 139 - 142 | .................................. | 347 - 351 | .................................. |
| 143 - 146 | .................................. | 352 - 355 | .................................. |
| 147 - 149 | .................................. | 356 - 360 | .................................. |
| 150 - 153 | (5 months) ...................... | 361 - 365 | (12 months) ..................... |

B.  For Insurances written for more or less than one year:-

1.  If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2.  If insurance has been in force for more than 12 months:

(a)  Determine full annual premium as for an insurance written for a term of one year.

(b)  Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

(c)  Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

All other Terms and Conditions remain unchanged.

---

**U.S. SPECIALTY INSURANCE COMPANY**
**RESTAURANT RECOVERY INSURANCE**

---

This endorsement effective on December 8, 2019 at 12:01 A.M. standard time,

forms a part of Policy No. U719-860418

Date endorsement issued: December 20, 2019          Endorsement number: 005

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

## LOUISIANA AMENDATORY ENDORSEMENT

**I.** Section **3. DEFINITIONS**, paragraph **3.19 ACT OF TERRORISM** is replaced by the following:

    **3.19  ACT OF TERRORISM** means an act of actual, alleged or threatened, intentional, malicious and wrongful alteration or contamination of any product(s), not limited to *Insured Product(s)*, by an individual or group whose announced or apparent objective is to further purported political, social, and/or religious beliefs, and which is intended to: (1) put the public at large, or a section of the public, in fear; or (2) coerce or intimidate a government or individuals to modify their behavior or policies.

    **ACT OF TERRORISM** does not include a *Certified Act of Terrorism* if the federal Terrorism Risk Insurance Act is in effect.

**II.** The following is added to Section **3. DEFINITIONS**:

    **CERTIFIED ACT OF TERRORISM** means an act that is certified by the Secretary of the Treasury to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a *Certified Act of Terrorism* include the following:

    **a)** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

    **b)** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**III.** Section **4. EXCLUSIONS**, paragraph **4.15** is replaced by the following:

    **4.15**  An actual or alleged *Act of Terrorism*. This exclusion shall not apply:

        **1.** In cases where the *Insured* or an *Insured Product* is the direct target of the act, or alleged *Act of Terrorism*; or

        **2.** To coverage provided by endorsement RRI 1007 01 15 (U.S. Terrorism Risk Insurance Act, as amended in 2015), if this endorsement is attached to the Policy.

**IV.** Section **6. GENERAL CONDITIONS**, paragraph **6.1 ACTION AGAINST THE INSURER** is replaced by the following:

### 6.1 ACTION AGAINST THE INSURER

No suit, action, or proceedings for recovery of any claim under Policy will be sustainable in any court of law, equity, or other tribunal unless the same be commenced within twenty four (24) months after a final statement of Loss has been submitted to the *Insurer* by the *Insured*.

**V.** Section **6.** **GENERAL CONDITIONS**, paragraph **6.6 CANCELLATION** is replaced by the following:

### 6.6 CANCELLATION

**(a)** This Policy may be cancelled by the *Insured* by the surrender of this Policy to the *Insurer* or by giving written notice to the *Insurer*, stating when thereafter such cancellation will be effective.

**(b)** This Policy may be cancelled by the *Insurer* by delivering to the *Insured* or by mailing to the *Insured* by registered or certified mail, at the *Insured's* Mailing address stated in Item **1** of the Declarations, written notice stating when, not less than one hundred and twenty (120) days thereafter, the cancellation will be effective, except in the case of cancellation for non-payment of premium by the *Insured*, in which case the *Insurer* will provide at least fifteen (15) days written notice. Notice shall also be delivered or mailed, at the same time and in the same fashion, to any mortgagee, pledgee or other known person shown by this Policy to have an interest in any Loss which may occur thereunder. The mailing of such notice will be sufficient proof of notice and this Policy will terminate at the date and hour specified in such notice.

**(c)** If this Policy has been in effect for more than sixty (60) days, or is a renewal of a Policy issued by the *Insurer*, the *Insurer* may only cancel this Policy for one or more of the following reasons:

    **i.** Nonpayment of premium;

    **ii.** Fraud of material misrepresentation made by or with the knowledge of the *Insured* in obtaining the Policy, continuing this Policy, or in presenting a claim under this Policy;

    **iii.** Activities or omissions on the part of the *Insured* which change or increase any hazard insured against, including a failure to comply with loss control recommendations;

    **iv.** Change in the risk which increases the risk of Loss after insurance coverage has been issued or renewed, including an increase in exposure due to regulation, legislation, or court decision;

    **v.** Determination by the commissioner of insurance that the continuation of this Policy would jeopardize the *Insurer's* solvency or would place the *Insurer* in violation of the insurance laws of this state or any other state;

    **vi.** Violation or breach by the *Insured* of any Policy terms of conditions; or

    **vii.** Other reasons that are approved by the commissioner of insurance.

**(d)** If this Policy is cancelled by the *Insured*, the *Insurer* will retain the short rate portion of the premium according to our short rate table filed with and approved by the Commissioner of Insurance and refund the remainder to the *Insured* within thirty (30) days of the *Insured's* request to cancel.

**(e)** If this Policy is cancelled by the *Insurer*, the *Insurer* will retain the pro-rata portion of the premium hereon. Payment or tender of any unearned premium by the *Insurer* will not be a

condition precedent to the effectiveness of cancellation, but such payment will be made a soon as practicable.

**VI.** Section **6. GENERAL CONDITIONS**, paragraph **6.8 CHOICE OF LAW AND FORUM** is replaced by the following:

**6.8    CHOICE OF LAW AND FORUM**

The construction, validity and performance of this Policy will be governed by the laws of the state of Louisiana. The *Insurer* and the *Insured* hereby expressly agree that all claims and disputes will be litigated in Louisiana courts.

**VII.** Section **6. GENERAL CONDITIONS**, paragraph **6.10 CONCEALMENT, MISREPRESENTATION, NON-DISCLOSURE, OR FRAUD** is replaced by the following:

**6.10       CONCEALMENT, MISREPRESENTATION OR FRAUD**

**(a)** Without prejudice to the *Insurer*'s other rights, howsoever arising, this Policy is null and void in case of any concealment, misrepresentation or fraud by any *Insured* of a material fact if made with the intent to deceive and is made either on the application for insurance or when negotiating the insurance contract.

**(b)** Except as provided in **(a)** above, no coverage will be provided in any case of concealment, misrepresentation or fraud by any *Insured* of a material fact concerning:

   **1.** This insurance; or
   **2.** The *Insured Product(s),* or the *Insured's* interest in the *Insured Product(s)*; or
   **3.** Any *Insured Event*, or any *Loss* or claim under this Policy.

**VIII.** Section **6. GENERAL CONDITIONS**, paragraph **6.23 RECOVERIES** is replaced by the following:

**6.23    RECOVERIES**

If the *Insured* shall sustain any *Loss* covered by this Policy, all recoveries (except from surety ship, insurance, reinsurance or indemnity taken by or for the benefit of the *Insurers*) on account of the *Loss* shall be distributed as follows:

The *Insured* shall be reimbursed for any *Loss* which exceeds the amount of coverage provided by this Policy less the *Deductible* amount. The *Insurer's* right of recovery from subrogation proceedings is secondary to the right of the *Insured* to be fully compensated for damages. Additionally, the *Insurer* agrees to pay its portion of the *Insured's* attorneys' fees or other costs associated with a claim or lawsuit to the extent that the *Insurer* recovers any portion of the benefits paid under this Policy pursuant to the *Insurer's* right of subrogation.

**IX.** Section **6. GENERAL CONDITIONS**, paragraph **6.29 SUBROGATION** is replaced by the following:

**6.29    SUBROGATION**

In the event of any payment under this Policy, the *Insurer* will be subrogated to the extent of such payment to all the *Insured's* rights of recovery. In such case the *Insured* will execute all documents required and will do everything necessary to secure and preserve such rights including the executions of such documents necessary to enable the *Insurer* effectively to bring suit in the name of the *Insured.* The *Insurer's* right of recovery from subrogation proceedings is secondary to the right of the Insured to be fully compensated for damages. Additionally, the *Insurer* agrees to pay its portion of the *Insured's* attorneys' fees or other

costs associated with a claim or lawsuit to the extent that the *Insurer* recovers any portion of the benefits paid under this Policy pursuant to the *Insurer's* right of subrogation.

**X.** Section **6. <u>GENERAL CONDITIONS</u>**, paragraph **6.32 SUIT AGAINST THE COMPANY** is replaced by the following:

**6.32    SUIT AGAINST THE COMPANY**

No suit or action on this Policy for the recovery of any Loss shall be sustainable in any Court of law or equity unless commenced within twenty four (24) months after the *Insured* first had knowledge of, or should have had knowledge of an *Insured Event*.

**XI.** The following are added to Section **6. <u>GENERAL CONDITIONS</u>**:

**NONRENEWAL**

If the *Insurer* elects not to renew this Policy, the *Insurer* will mail or deliver to the *Insured* at the *Insured's* Mailing address stated in Item **1** of the Declarations written notice of nonrenewal at least sixty (60) days before the expiration date of this Policy. If notice is mailed, proof of mailing will be sufficient proof of notice.

**PAYMENT OF CLAIMS**

The *Insurer* shall pay the amount of any claim due the *Insured* within thirty (30) days of receipt of satisfactory proofs of loss from the *Insured* or any party in interest.

All other Terms and Conditions remain unchanged.



JOHNSTONE PARTNERS, LLC.

Tokio Marine HCC – Specialty Group
37 Radio Circle Drive
Mt. Kisko, NY 10549

7 May 2020

<u>Attention: Mr. Ronald Nfor, Esq., Claims Attorney</u>

Insurance Claim #:     RRI-1900173
JP Reference #:        JP20157

## **PRELIMINARY REPORT**

| | | |
|---|---|---|
| REPORT NO | : | (1) |
| POLICY NO | : | Policy # U719-860418, Restaurant Recovery Insurance |
| INSURED | : | New Orleans Equity, LLC<br>209 Bourbon Street<br>New Orleans, LA 70130 |
| PERIOD OF INSURANCE | : | December 8, 2019 to December 9, 2020 |
| POLICY COVERAGE | : | Accidental Contamination, Malicious Product Tampering, Product Extortion, Adverse Publicity, Workplace Violence |
| DATE OF NOTIFICATION | : | 6 April 2020 |
| NUMBER OF LOCATIONS | : | 2 |
| INCIDENT | : | Impact upon business due to COVID-19 pandemic |
| INSURED'S CLAIM | : | To be determined, impact on-going |
| POLICY LIMITS | : | USD 2,000,000 per affected Location (Accidental Contamination, Malicious Tampering)<br>USD 2,000,000 in the aggregate |
| RETENTION | : | Nil per Insured Event; 5 day Waiting Period for Loss of Gross Revenue |

Please accept this as our preliminary report following our recent discussions with the Insured, a review of their submitted documents, in review of the details of this event.

<div style="background:yellow"><b>EXHIBIT B</b></div>

## **EXECUTIVE SUMMARY**

➤ This matter involves the impact on the Insured's business due to the COVID-19 pandemic.

➤ The Insured operates 2 owned locations in New Orleans, LA under the brand name Galatoire's.

➤ Restaurants in Louisiana have been ordered by the state government to suspend service and not permit on-premises consumption as of 17 March 2020.  This order is still in place although a phased re-opening is expected to be announced soon.

➤ Off-premises sales in the form of delivery, drive-through, pick up etc. are encouraged during this period in Louisiana.

➤ The Insured is also subject to the authority of the City of New Orleans, which has also banned dine-in services at restaurants as of 17 March 2020.

➤ The Insured's two locations, which are next door to each other, have been consolidated into one off-premises service during these restrictions.

➤ Off-premises sales have not historically formed a significant portion of the Insured's revenue.

➤ The Insured laid-off 130 of its staff on 16 & 17 March, with only the management team retained.  It is the management team that is fulfilling all off-premises orders at present.

➤ The Insured reports an estimated impact upon revenue of USD1,100,000 - 1,200,000 for the month of April.

➤ At least one of the Insured's employees was diagnosed with COVID-19 and his case, and the restaurant's name, were reported upon in a local newspaper.  The publicity supplied by the Insured post-dates the Government orders and there is no allegation that the restaurant was the source of the virus.

➤ The Insured reports several possible cases of COVID-19 amongst its staff, however the Insured has not enquired further due to concerns on breaching privacy regulations.

➤ The Insured's restaurant (partial) closures were a result of the Government orders and not due to any contamination of its premises, personnel or products.

➤ Policy liability investigation remains on-going.

## **INVESTIGATION**

We acknowledge with thanks receipt of this assignment on 5 May 2020. Included with the initial notice we confirm receipt of the following documents:

➤ Copy of Restaurant Recovery Insurance reference U719-860418

➤ Acord Notice of Loss form

2

➢ Email chain regarding publicity connected to the restaurants

➢ Email chain regarding initial notice

➢ Restaurant financials

➢ Loss estimate spreadsheet

➢ Tokio Marine HCC Demand Letter

➢ Acknowledgement letter

➢ Claim summary dated 7 April 2020

Following review of the email notification of loss, we reached out to Melvin Rodrigue at New Orleans Equity, LLC. An initial call was held on May 7, 2020; participants on the call included:

| Name and Title | Company |
|---|---|
| Melvin Rodrigue, President & CEO | New Orleans Equity, LLC |
| Mary Mercado, Broker | AJG |
| Cindy Burst, Broker | AJG |
| Bill Johnstone | Johnstone Partners |
| Matt Hagan | Johnstone Partners |
| Emily Ibarra | Johnstone Partners |

This report will review the details of our investigation to date and will update Insurers regarding the Insured's expected losses and next steps we need to pursue in the investigation of this event and assessment of damages.

## **INSURED**

The Insured operates two restaurants in the historic French Quarter of New Orleans, LA.  The restaurants are adjacent, with one a high-end restaurant (the first restaurant) and the other a more casual bar and steakhouse.  Both incorporate the Galatoire's brand and name.

The first restaurant was established in 1905 and celebrates its 115 year anniversary this year.  It has not moved location in that time.  It is a French creole cuisine restaurant and is something of a landmark in the city.

Pre-crisis, the Insured had 160 employees, over half of whom had more than 20 years tenure with the company.  Sales in recent years have been c. USD12,000,000 - 13,000,000 across the two restaurants.

Private dining (on-site) and event catering (both on- and off-site) typically make up 25% of overall revenue.  Within this 25% is any off-premises sales to individuals, but this is a very low proportion of the figure.

**STATE GOVERNMENT ORDERS**

**Louisiana:**

On 16 March, the Governor of Louisiana announced increased measures to reduce the spread of COVID-19 in Louisiana. Closing dine-in services for restaurants and bars, Executive Order JBE-EO-30 (attached as **Enclosure #1**) stated that as of 17 March:

> "*all restaurants, cafes, and coffee shops, statewide, shall cease allowing for any on premises consumption of food or beverages.*"

Most recently, this order was extended from 1 May to expire on 15 May.

Similarly, on 16 March the City of New Orleans issued its own order (**Enclosure #2**) that limited restaurants to "*take out and delivery only*". This went into effect on 17 March until 16 April and was subsequently extended to 16 May.

We refer to the above orders collectively as Government Restrictions.

**IMPACT OF COVID-19**

The Insured started seeing the impact of the COVID-19 pandemic in early March as companies began to restrict corporate travel. The Insured's sales are slightly seasonal with regard to the calendar of events at the New Orleans convention centre which is a short distance away. This impacted the Insured's private dining and catering revenue streams, which accounts for c. 25% of overall revenue.

Towards mid-March, as awareness of the pandemic increased, private events booked by individuals rather than corporations began to be cancelled by those individuals. All of these bookings required a deposit and the return of deposits began to affect the Insured's finances at that time.

The Insured received notice of the Government Restrictions on 16 March and spent that evening planning with its management team. The decision was made to lay off all of the non-management employees, some 130 people. The offerings across both restaurants were consolidated into one limited menu and the management staff are running the kitchen and off-premises services.

The Insured states that several staff members showed symptoms of COVID-19 and self-isolated. Due to concerns over privacy, the Insured did not make further enquiries and reported no impact upon its operations.

The Insured reports that it grossed USD1,161,000 in the month of April 2019. This figure was USD1,300,000 in April of 2018; the variance year on year is said to be due to the conference/convention season, which started earlier in 2019. In April 2020, the Insured's revenue was USD98,000. Some research would have to be performed for accuracy, but subject to advance bookings and the dates of conference and conventions, it is likely that the impact upon the Insured's revenue exceeds USD1,000,000 to date.

The Insured reports that it has increased its sanitation efforts in the current environment.   The Insured requested guidance from Insurers regarding whether its current sanitation practices are sufficient or whether Insurers would prefer a professional contractor is retained.  We responded to say that we would pass this query to Insurers and revert to the Insured.

## NEW REPORTS

The Insured reports that it is aware that several of its vendors have employees who have tested positive for COVID-19.  No specifics were given for these instances and no suggestion was made that supplies to the Insured were contaminated.

To lay off the 130 staff on 17 March, the Insured organised meetings in groups of no more than 50 people given the restrictions in Louisiana on large gatherings.  Present at one of those meetings was waiter John Fontenot, who has over 50 years tenure as a Galatoire's employee. He was let go at that meeting and later diagnosed with COVID-19 (exact date to be confirmed). His condition worsened and he spent several weeks in intensive care in hospital (but has since recovered).

His case was noted in a local news publication on 14 April and can be viewed via the below link

> https://www.nola.com/news/coronavirus/article_aaae1edc-7ddd-11ea-ae04-67452a510f74.html?utm_medium=social&utm_source=email&utm_campaign=user-share

Although the Insured's restaurant is named many times throughout the article, which is as much about the restaurant as it is about Mr Fontenot, there is no link made between the contraction of the virus and the restaurant.  Mr Fontenot was present in the restaurant on and before 17 March, and it appears to be the Insured's assertation that Mr Fontenot being on site shows that the restaurant was contaminated with COVID-19.

The Insured also provided an article concerning its 'customer' who also contracted the virus.  This customer is Sean Payton, the current head coach of the New Orleans Saints.  It is clear that Mr Payton contracted COVID-19, however there is nothing in the article linking this to the Insured's restaurants nor any mention of Galatoire's.  The article can be found here:

> https://www.nola.com/news/coronavirus/article_c9d55f3c-6a1e-11ea-a747-d37303a2bee0.html?utm_medium=social&utm_source=email&utm_campaign=user-share

There is no evidence, other than the circumstantial presence of a person who later tested positive for COVID-10 (Mr Fontenot), that the premises or products were contaminated with COVID-19. Other than the Insured's adamance that the Policy is triggered, we are aware of no allegations that consumption of the Insured's products led to any bodily injury.

To date, whilst there is no doubt that the COVID-19 pandemic has had a significant negative effect upon the Insured's business, it appears that the proximate cause of the Insured's losses is the effect of the pandemic upon customer demand, exacerbated by the imposition of Government Restrictions.

## POLICY LIABILITY

The policy issued by Tokio Marine HCC is Restaurant Recovery Insurance, with Policy #U719-860418, effective December 8, 2019 to December 9, 2020 to New Orleans Equity LLC of 209 Bourbon Street, New Orleans, LA 70130.

Coverage limits in the policy include but are not limited to the following:

| DESCRIPTION | AMOUNT (USD) |
| --- | --- |
| Accidental Contamination | 2,000,000 |
| Malicious Tampering | 2,000,000 |
| Product Extortion | 2,000,000 |
| Adverse Publicity | 500,000 |
| Workplace Violence | 250,000 per affected Location 500,000 in the aggregate |
| Self-Insured Retention | Nil per Insured Event, 5 day Waiting Period for Loss of Gross Revenue |

We understand that Insurers will be making all decisions regarding policy trigger and coverage. As the supporting documents are made available we will address any coverage or exclusion issues that may be related to this event and should be brought to Insurers' attention.

If there is anything further that we can provide at this time, to assist with those decisions, please advise and we will respond accordingly.

## OTHER INSURANCE & MITIGATION

The Insured has confirmed that it received a federal loan under the Paycheck Protection Program (PPP).  It has held this loan to the side due to the uncertainty over the forgiveness rules.  Part of the uncertainty likely stems from the requirement that 75% of the loan be used to cover payroll for it to be eligible to convert the loan into a grant.  Many businesses are realising that with severely reduced payroll due to significant levels of layoffs, current payroll obligations do need reach 75% of the loan value.

The Insured's property insurers have issued a denial for the claim under that policy.

## SUMMARY

There are several aspects of this matter that possibly warrant further investigation for clarification purposes, however given the contents of this report we await Insurers instructions as to whether further investigation is necessary.

As mentioned in the body of the report, the Insured is adamant that the Policy should respond to its claims.  The Insured has requested a decision on Policy cover from Insurers as soon as possible so that it may consider next steps.

We would appreciate a discussion with Insurers once the contents of this report have been digested.

Yours sincerely,

Johnstone Partners

Matt Hagan

Bill Johnstone

Enclosures

1. Louisiana Order
2. New Orleans Order

This Report is prepared and supplied subject to the terms of our engagement on this matter and in particular to our Standard Terms of Business of which a copy can be obtained via email request. Please note that the professional liability of Johnstone Partners in connection with this matter is limited to the lesser of US $1,000,000 or eight times the value of our fees.

EXECUTIVE DEPARTMENT

PROCLAMATION NUMBER JBE 2020 – 30

## ADDITIONAL MEASURES FOR COVID-19 PUBLIC HEALTH EMERGENCY

**WHEREAS,** pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, *et seq.*, the Governor declared a Public Health emergency in Proclamation Number 25 JBE 2020;

**WHEREAS,** on March 13, 2020, in emergency proclamation 27 JBE 2020, the Governor supplemented the measures taken in his declaration of a Public Health Emergency with additional restrictions and suspensions of deadlines and regulations in order to protect the health and safety of the public from the threat of COVID-19;

**WHEREAS,** the order was further supplemented on March 14, 2020 with additional measures necessary to ensure that goods and supplies can be delivered within the State of Louisiana; that health care providers can be available for treatment of those affected with COVID-19; that certain fees and fines for the Department of Health for those affected by the disaster are waived; that certain insurance regulations may be lifted by the Commissioner of Insurance; and that workers who lose employment because of this emergency are able to obtain unemployment benefits in a timely manner;

**WHEREAS,** in the days since the declaration of public health emergency, the COVID-19 outbreak in Louisiana has expanded significantly;

**WHEREAS,** additional measures are necessary to protect the health and safety of the public;

**WHEREAS,** these measures are in line with the best guidance and direction from the White House, the Centers for Disease Control, and state health officials;

**WHEREAS,** these measures relating to gaming establishments, restaurants, bars, cafes, and coffee shops are necessary because of the ability of the COVID-19 virus to spread via personal interactions and because of physical contamination of property due to its propensity to attach to surfaces for prolonged periods of time; and

**WHEREAS,** all of these additional restrictions and suspensions will run concurrent with the term of the initial emergency declaration; however, such term shall be extended or shortened as circumstances dictate.

**NOW THEREFORE, I, JOHN BEL EDWARDS,** Governor of the State of Louisiana, by virtue of the authority vested by the Constitution and the laws of the State of Louisiana, do hereby order and direct as follows:

**SECTION 1:** In an effort to reduce and limit the spread of COVID-19 in Louisiana, and to preserve the health and safety of all members of the public, all gatherings of **50** people or more between 12:00 a.m. Tuesday, March 17, 2020 and Monday, April 13, 2020 shall be postponed or cancelled. This applies only to gatherings in a single space at the same time where individuals will be in close proximity to one another. It does not apply to normal operations at locations like airports, medical facilities, shopping centers or malls, office buildings, factories or manufacturing facilities, or grocery or department stores. This order does not limit the ability of a local

17, 2020, all casinos, video poker establishments, movie theaters, bars, bowling alleys, and fitness centers and gyms, statewide, shall cease operations completely. Any truck stop may remain in operation but shall cease all gaming operations. Race tracks may remain open but no members of the public may be allowed therein and no gaming operations shall be allowed. These restrictions shall remain in place until 11:59 p.m. on April 12, 2020, unless terminated earlier.

**SECTION 3:** Pursuant to La. R.S. 29:766 et seq. the Governor has determined that some business establishments are unable to continue current operations without unacceptable risks to the health and safety of the public. Therefore, at 12:00 a.m. on Tuesday, March 17, 2020, all restaurants, cafes, and coffee shops, statewide, shall cease allowing for any on premises consumption of food or beverages. Any establishment affected by this order may continue take out, drive-thru, and delivery services, however, in no circumstance shall the food or beverages purchased be consumed on premises. Hotel restaurants may continue operations, but only for the service of registered hotel guests via room service. These restrictions shall remain in place until 11:59 p.m. on April 12, 2020, unless terminated earlier.

**SECTION 4:** All state agencies, boards and commissions, and local political subdivisions of the state shall provide for attendance at essential governmental meetings via teleconference or video conference and such attendance shall be allowed during the pendency of this emergency. All efforts shall be made to provide for observation and input by members of the public. Before any meeting conducted pursuant to this section, the state agency, boards and commission, or local political subdivision of the state shall first provide a written certification that it will otherwise be unable to operate due to quorum requirements. Such certification shall be posted at the same time and in the same manner as the agenda for the meeting. Nothing in this order shall be interpreted to waive any notice requirements.

**SECTION 5: A.** Legal deadlines, including liberative prescription and peremptive periods applicable to legal proceedings in all courts, administrative agencies, and boards, are hereby suspended until at least Monday, April 13, 2020, including, but not limited to, any such deadlines set forth by law within the following:

    1.    Louisiana Civil Code;

    2.    Louisiana Code of Civil Procedure;

    3.    Louisiana Code of Criminal Procedure;

    4.    Louisiana Children's Code;

    5.    Title 9 of Louisiana Revised Statutes, Civil Code Ancillaries;

    6.    Title 13 of Louisiana Revised Statutes, Courts and Judicial Procedure;

    7.    Title 14 of Louisiana Revised Statutes, Criminal Law;

    8.    Title 15 of Louisiana Revised Statutes, Criminal Procedure;

    9.    Title 18 of Louisiana Revised Statutes, Louisiana Election Code;

   10.    Title 23 of Louisiana Revised Statutes, Labor and Worker's Compensation;

   11.    Title 32 of Louisiana Revised Statutes, Motor Vehicles and Traffic Regulations;

   12.    Title 40 of Louisiana Revised Statutes, Public Health and Safety;

   13.    Title 47 of Louisiana Revised Statutes, Revenue and Taxation;

**B.** In addition, all other deadlines in legal proceedings in all courts, administrative agencies, and boards shall be suspended until Monday, April 13, 2020.

**C.** Courts, administrative agencies and boards statewide shall use due diligence in communicating with attorneys, parties to proceedings with pending deadlines, and the public how the court, agency or board will implement and interpret the provisions of this Order.

**D.** Paragraph B of this Section shall not be interpreted so as to prohibit an owner of immovable property from reclaiming leased property if abandoned as provided by law, or entering leased property to make necessary repairs as provided by law.

**SECTION 6:**  Pursuant to La. R.S. 14:329.6, a state of emergency is declared to exist statewide for the purposes of allowing the chief law enforcement officer of any political subdivision to, in order to protect life and property and to bring the emergency situation under control, promulgate orders for any provision therein, including a local curfew from 10:00 p.m. to 5:00 a.m.

**SECTION 7:**  The following additional provisions relating to the Office of Motor Vehicles are hereby suspended:

**A.** The expiration date of driver's licenses which expire on or after March 9, 2020, but on or before May 10, 2020, is suspended and the expiration date is extended to May 20, 2020.

**B.** The expiration of a temporary driver's license issued pursuant La R.S. 32:667(A) which were issued on or after March 9, 2020 through May 10th, 2020 is suspended until June 9, 2020.

**C.** All students who enroll in a driver's education course after March 9, 2020 shall be allowed to begin the driver's education course without the issuance of the temporary instructional permit until May 10, 2020.

**D.** Any suspension for which the official notice of withdrawal was issued on or after Feb 17,2020, but before May 10, 2020, shall remain pending until June 9,2020.

**SECTION 8:**  For procurement and contracting, strict compliance with the Louisiana Procurement Code (La. R.S. 39:1551, *et seq.*), Telecommunications Procurement (La. R.S. 39:1751-1755), and Information Technology Procurement (La. R.S. 39:196-200), shall not be required. However, all state agencies should comply with the following conditions:

**A.** An appointed official within the agency, or the equivalent for officials in higher education, must determine that the failure to strictly comply with the statutory restriction is necessary due to the emergency.

**B.** A centralized point of contact for each agency must monitor all transactions conducted without strict statutory compliance, maintaining copies of all documentation. Documentation should specify whether the purchase falls into the "emergency" or "permanent" category and whether the purchase relates to the COVID-19 event referenced in Proclamation Number 25 JBE 2020 and all documentation must be maintained and available for audit and FEMA reimbursement purposes.

**C.** Written competitive quotes and/or offers must be obtained whenever possible

**E.** Statewide contracts should be used where practical.

**F.** To the maximum extent possible, such emergency contracts should be only for the duration of the emergency or to allow the agency time to comply with normal competitive bidding requirements if the goods or services will be required for an extended period of time.

**G.** Copies of contracts which would otherwise require approval by the Office of State Procurement and the supporting documentation discussed above must be provided to the Office of State Procurement within thirty (30) days or sooner, if practical. Additionally, LaGov agencies should enter small purchases into the LaGov system as soon as practical. The Office of State Procurement shall review the contracts and documentation to determine compliance with this Executive Order

**H.** Payments to contractors should be made only after verification that all goods and services meet contract requirements.

**I.** All Public Bid Openings shall be suspended. Bid openings will continue, however public openings will not occur in order to limit the potential for exposure. Bid openings will be made available via phone conference or web conference.

**J.** All required Procurement Support Team meetings will be held via phone conference or web conference.

**SECTION 9:** All departments, commissions, boards, agencies and officers of the State, or any political subdivision thereof, are authorized and directed to cooperate in actions the State may take in response to the effects of this event.

**SECTION 10:** These provisions extend from 12:00 a.m. on Tuesday, March 17, 2020 to Monday, April 13, 2020, unless terminated sooner.



**IN WITNESS WHEREOF,** I have set my hand officially and caused to be affixed the Great Seal of Louisiana in the City of Baton Rouge, on this 16th day of March, 2020.

_____
**GOVERNOR OF LOUISIANA**

**ATTEST BY THE**
**SECRETARY OF STATE**


_____
**SECRETARY OF STATE**

**STATE OF LOUISIANA**

NO. 2020-02602    DIVISION " G "        DOCKET 11

**CITY OF NEW ORLEANS**

FILED: _____    _____

                                  **DEPUTY CLERK**

## MAYORAL PROCLAMATION TO PROMULGATE EMERGENCY ORDERS DURING THE STATE OF EMERGENCY DUE TO COVID-19

 **WHEREAS,** the United States has confirmed cases of individuals who have a severe acute respiratory disease ("COVID-19" ) caused by a novel coronavirus ("the virus") first detected in Wuhan, Hubei Province, People's Republic of China, which was first reported on December 31, 2019; and

 **WHEREAS,** as of March 15, 2020, the World Health Organization ("WHO") has reported more than 153,000 confirmed cases of COVID-19 in 143 countries, and 5,735 deaths from the virus, with the number of confirmed cases escalating dramatically over a short period of time; and

 **WHEREAS,** on March 11, 2020, the WHO declared the COVID-19 outbreak a pandemic; on January 31, 2020, the U.S. Department of Health and Human Services declared a Public Health Emergency for the United States; on March 11, 2020, Governor John Bel Edwards declared a state of emergency for the State of Louisiana; and on March 11, 2020, I declared a state of emergency in the City of New Orleans due to COVID-19; and

 **WHEREAS,** the Centers for Disease Control and Prevention ("CDC") has determined that the virus presents a serious public health threat, requiring coordination among state and local health departments to ensure readiness for potential health threats associated with the virus; and

 **WHEREAS,** the New Orleans Health Department, the Louisiana Department of Health, and other City partners have been working successfully and diligently to implement CDC guidelines and assist with the ongoing and developing threat of COVID-19; and

**WHEREAS,** as of March 15, 2020, there were 103 presumptive positive cases of COVID-19 in the State of Louisiana, 75 of which are in the City of New Orleans; and

**WHEREAS,** as of March 15, 2020, two cases of COVID-19 in the State of Louisiana and City of New Orleans have resulted in patient deaths; and

**WHEREAS,** there is reason to believe that COVID-19 may be spread amongst the population by various means of exposure, including the propensity to spread person to person and the propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances; and

**WHEREAS,** the direct and definite public health and safety threats of COVID-19, and the related threats to the health, safety, and welfare of the residents of the City of New Orleans, are now imminent and emergency action must be taken to mitigate the effects of COVID-19, prevent further deaths and injuries of persons, and preserve the lives and property of the people of the City of New Orleans; and

**WHEREAS,** the Louisiana Homeland Security and Emergency Assistance and Disaster Act, La. R.S. 29:721, *et seq.*, confers upon the Mayor of the City of New Orleans emergency powers to deal with emergencies and disasters, including those resulting from terrorist events, enemy attack, sabotage, or other hostile action, or from fire, flood, earthquake, or other natural or manmade causes, in order to ensure that preparations of this City will be adequate to deal with such emergencies or disasters, and in order to detect, prevent, prepare for, investigate, respond to, or recover from these events, and to preserve the lives and property of the people of the City of New Orleans; and

**WHEREAS,** La. R.S. 29:727(F) authorizes the Mayor to "control ingress and egress to and from the affected area, the movement of persons within the area, and the occupancy of premises therein", and to "suspend or limit the sale, dispensing, or transportation of alcoholic beverages . . ."; and

community transmission should cancel gatherings of any size; and

**WHEREAS,** all residents of and visitors to Orleans Parish should take personal responsibility to prevent the further spread of COVID-19, including but not limited to, avoiding gatherings and practicing social distancing; and

**WHEREAS,** all businesses, colleges, and universities should scale down operations to prevent the further spread of COVID-19;

**NOW THEREFORE, I, LATOYA CANTRELL,** Mayor and Chief Executive Officer of the City of New Orleans and the Parish of Orleans, by virtue of the authority vested in me as the Mayor of the City of New Orleans by the Constitution and laws of the State of Louisiana and the Home Rule Charter and laws of the City of New Orleans, do hereby promulgate and issue the following orders, which shall be effective March 17, 2020, commencing at 6:00 a.m. and remain in effect until 6:00 a.m. on April 16, 2020, pursuant to La. R.S. 29:727 and my Mayoral Proclamation of a State of Emergency due to COVID-19 dated March 11, 2020.

1. All public and private gatherings shall be canceled or prohibited in non-emergency situations and where possible. In limited circumstances, personal gatherings should be limited to the number of persons in a reasonable household size. This shall not apply to healthcare facilities, pharmacies, grocery stores, corner stores, banks, gas stations, and other essential service providers. Loitering outside of any of these essential service providers shall be prohibited.

2. Bars, Health Clubs (e.g. gyms and fitness centers), Shopping Centers configured as malls (but not strip centers), Live Performance Venues, Reception Facilities, and other establishments where large gatherings routinely occur and/or where the risk of possible COVID-19 spread exists, shall cease operations.

accordance with City and State issued permits.

The City Attorney is directed to file this proclamation promptly in the office of the Clerk of Court.

**WITNESS** my hand in New Orleans, Louisiana this *16th* day of *March*, **2020**.


_____
**LATOYA CANTRELL, MAYOR**