UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NEW ORLEANS EQUITY, L.L.C. | CIVIL ACTION |
| VERSUS | NO. 20-1935 |
| U.S. SPECIALTY INSURANCE CO. | SECTION M (2) |

**ORDER & REASONS**

Before the Court is the motion of plaintiff New Orleans Equity, L.L.C. ("New Orleans Equity") for summary judgment on the issue of coverage.[1] Defendant U.S. Specialty Insurance Company ("USSIC") responds in opposition.[2] Also before the Court is USSIC's own motion for summary judgment[3] which New Orleans Equity opposes.[4] USSIC replies in further support of its motion.[5] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying New Orleans Equity's coverage claim.

**I.   BACKGROUND**

This case involves a dispute as to whether losses allegedly caused by COVID-19 are covered under an insurance policy. New Orleans Equity operates two adjoining restaurants, Galatoire's Restaurant and Galatoire's 33 Bar & Steak, on Bourbon Street in New Orleans.[6] One of its employees was infected with COVID-19.[7] Unaware he had contracted the illness, the employee continued to work, in particular on the weekend of March 13-15, 2020.[8] As a result,

---

[1] R. Doc. 61.
[2] R. Doc. 67.
[3] R. Doc. 64.
[4] R. Doc. 69.
[5] R. Doc. 79.
[6] R. Doc. 29 at 3.
[7] *Id.* at 12.
[8] *Id.*

New Orleans Equity alleges that the employee "accidentally and extensively contaminated food, drinks, condiments, ingestible garnishes, food preparation stations, plates, silverware, glasses, cups, saltshakers, and other receptacles" at both restaurants with COVID-19.[9]

USSIC issued Restaurant Recovery Insurance Policy No. U719-860418 with respect to the two restaurants for a period including March 2020.[10] Under the policy, if there is an "accidental contamination" of an "insured product" (as those terms are defined by the policy), business interruption losses are covered.[11] The policy does not contain a COVID-19 or general virus exclusion.[12] After New Orleans Equity provided notice of a claim that it had sustained a loss due to this alleged contamination, USSIC hired Johnstone Partners to investigate.[13] Johnstone Partners found that business at the restaurants had begun to slow down as a result of a decline in tourism because of the pandemic.[14] On March 17, 2020, the State of Louisiana and the City of New Orleans ordered all restaurants, including New Orleans Equity's, to stop on-location dining.[15] Johnstone Partners did not find evidence that any "insured product," as defined by the policy, had been contaminated.[16] As a result, USSIC denied coverage and this lawsuit followed.[17]

## II. PENDING MOTION

In its motion for summary judgment, New Orleans Equity argues that USSIC is attempting to rewrite the policy to require the insured to show scientific proof of contamination in the form of test results and evidence of actual illness in order to trigger coverage.[18] Further, New Orleans

---

[9] *Id.*
[10] *Id.* at 4.
[11] R. Docs. 61-19 at 1; 67-7 at 1-2.
[12] R. Docs. 61-19 at 2; 67-7 at 2.
[13] R. Doc. 64-1 at 2.
[14] *Id.*
[15] R. Docs. 61-10; 64-4 at 108-11.
[16] R. Doc. 64-1 at 2.
[17] *Id.*
[18] R. Doc. 61-1 at 2.

Equity submits that the policy term "Insured Product" should be defined broadly to include not only food, but also adjacent items such as the plates and tables.[19] Ultimately, New Orleans Equity argues that USSIC acted in bad faith by denying coverage without a proper investigation.[20] In opposition, USSIC argues that New Orleans Equity is applying a strained interpretation of the policy.[21] USSIC maintains that there is no testing requirement under the policy, but New Orleans Equity still bears the burden of proving that an insured event occurred.[22]

In its motion for summary judgment, USSIC argues that the burden is on New Orleans Equity as the insured to prove coverage.[23] By the terms of the policy, USSIC says that New Orleans Equity must prove that (1) an insured event occurred, (2) the event was reported to USSIC as required by the notice of incident provision, and (3) the insured event directly and solely caused a loss.[24] Because it has failed to carry that burden, USSIC says that coverage must be denied.[25] In opposition, New Orleans Equity argues that under USSIC's interpretation of the policy, a restaurant could never establish coverage because "there is never an ability to test the food that caused the illness."[26] Accordingly, New Orleans Equity says that USSIC is selling an illusory policy that could never provide coverage.[27]

### III. LAW & ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[19] *Id.* at 5-7.
[20] *Id.* at 19-22.
[21] R. Doc. 67 at 2-5.
[22] *Id.* at 8-12.
[23] R. Doc. 64-1 at 1.
[24] *Id.* at 5-6.
[25] *Id.* at 6-13.
[26] R. Doc. 69 at 1.
[27] *Id.* at 5-7.

any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*,

572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. Insurance Policy Interpretation

By the terms of the contract, the policy is governed by Louisiana law.[28] Under Louisiana law, an insurance policy, like any other contract, is construed according to the general rules of contract interpretation set forth in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). Contracts are interpreted to determine "the common intent of the parties." *Id.* (citing La. Civ. Code art. 2045). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have

---

[28] R. Doc. 61-4 at 28.

acquired a technical meaning." *Id.* (citing La. Civ. Code art. 2047). An insurance policy "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *Id.* A court cannot exercise "inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Id.* Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written. *Id.*

On the other hand, ambiguous provisions and "equivocal provisions seeking to narrow an insurer's obligation" are strictly construed against the insurer and in favor of coverage. *Id.* However, the strict construction principle applies only if the ambiguous policy provision is susceptible of more than one reasonable interpretation. *Id.* "The determination of whether a contract is clear or ambiguous is a question of law." *Id.* While the insured has the burden of proving that the circumstances constitute a covered claim, the insurer has the burden of proving that any exclusions apply. *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000).

## C. Analysis

### 1. Insured Products

According to the terms of the policy, "[t]he *Insurer* will reimburse the *Insured* for its Loss … caused by or resulting from any of the following *Insured Events* first discovered during the Policy Period and reported to the *Insurer*."[29] One of the types of insured events, and the one claimed by New Orleans Equity in this case, is "Accidental Contamination."[30]

Accidental contamination is defined as

[a]ny accidental or unintentional contamination, impairment or mislabeling of an *Insured Product(s)*, which occurs during or as a result of its production, preparation,

---

[29] R. Doc. 61-4 at 5 (italics in original indicating defined terms under the insurance policy).
[30] *Id.*

> manufacture, packaging or distribution – provided that the use or consumption of such *Insured Product(s)* has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use.[31]

An insured product is defined as

> all ingestible products for human consumption, or any of their ingredients or components, that have been reported to the *Insurer* on the application on file with the *Insurer* for the effective dates of this Policy or by addendum to such application and that are:
> a. in production; or
> b. have been manufactured, handled or distributed by the *Insured*; or
> c. manufactured by any contract manufacturer for the *Insured*; or
> d. being prepared for or are available for sale; or
> e. all ingestible products for human consumption served at any restaurant location operating under the same trade name as the *Insured*.[32]

New Orleans Equity contends that the restaurants fall under the definition of insured products. It emphasizes the phrase in the definition that discusses products that have "been reported to the *Insurer* on the application on file with the *Insurer*." Extending this logic, New Orleans Equity contends that the restaurants themselves should be considered insured products as they are listed on the application.[33] Therefore, under its argument, an infected employee entering a restaurant would constitute an accidental contamination. This strained argument ignores the beginning of the definition, however, which limits insured products to "ingestible products for human consumption … that have been reported to the *Insurer* on the application." Therefore, because restaurants are not ingestible products, they cannot fit within the policy definition of insured products. Nor can restaurants be considered "ingredients or components" of "ingestible products for human consumption," the referent for the phrase "ingredients or components" under

---

[31] *Id.* (italics in original indicating defined terms under the insurance policy).
[32] *Id.* at 9-10 (italics in original indicating defined terms under the insurance policy).
[33] R. Doc. 61-21 at 2.

prevailing rules of grammar. To interpret the policy otherwise would be unreasonable, transforming the contract into a property insurance policy.

The same analysis applies to New Orleans Equity's argument that the "service" provided by its restaurants is an insured product. As one district court analyzing a similar USSIC policy explained, "Plaintiff[s'] interpretation is unreasonable as applied to this more specific definition and as a whole, the contract intends the term 'Insured Products' to apply to ingestible items. Those products, despite Plaintiffs' argument, do not include the actual service of food to onsite customers." *Egg and I, LLC v. U.S. Specialty Ins. Co.*, 2021 WL 769658, at *2 (D. Nev. Feb. 25, 2021). "Such service is not ingestible, susceptible to contamination or recall, or described as merchantable." *Id.* at *3. In granting the insurer's motion to dismiss, the court in *Egg and I* reviewed the insurance policy as a whole to conclude that the insured's interpretation – namely, that the term "insured products" included non-ingestible items such as customer service – was unreasonable. *Id.*

Finally, New Orleans Equity argues that the policy also covers other non-ingestible products because the definition of insured products includes "components."[34] It argues that non-ingestible items such as plates, tablecloths, and saltshakers are insured products as they are components of ingestible products. This, too, is not a reasonable interpretation of the policy language: the term "component" (which means "a constituent element or part"),[35] like the term "ingredient," clearly refers back to the phrase "ingestible products for human consumption." A garnish, for example, would be a component of a prepared entrée while not itself an ingredient, but it would still be ingestible. Regardless, New Orleans Equity also runs into trouble trying to

---

[34] R. Doc. 61-1 at 5 (quoting R. Doc. 61-4 at 9).
[35] *Component*, Oxford English Dictionary (2020).

8

establish coverage because it has not sustained its summary-judgment burden to show contamination of any of its products – whether ingestible or not.

### 2. Accidental Contamination

The heart of this case is whether New Orleans Equity can show if any of its insured products were contaminated. On summary judgment, USSIC need only identify the absence of factual support for one or more elements essential to New Orleans Equity's claim of insurance coverage. If it does so, the burden shifts to New Orleans Equity to come forward with evidence establishing the element or evincing a genuine issue of material fact concerning the element. New Orleans Equity has not borne this burden with respect to the essential element of contamination.

In a case involving a policy similar to New Orleans Equity's, the court held: "To substantiate a finding of contamination under the Policy, objectively verifiable evidence that a product was *actually* contaminated is required." *Ruiz Food Prods., Inc. v. Catlin Underwriting U.S., Inc.*, 2012 WL 4050001, at *6 (E.D. Cal. Sept. 13, 2012) (granting summary judgment in favor of insurer where there was no evidence presented of actual contamination or impairment that would result in injury) (emphasis in original). "A *potential* of a defect in the product is insufficient. The mere possibility that a product may contain a contaminant does not trigger coverage." *Id.* at *11 (emphasis in original). As USSIC has shown,[36] New Orleans Equity points to no evidence establishing that its products were actually contaminated.

New Orleans Equity is particularly frustrated by the notion that a testing requirement could be read into the policy because there was no available testing that could detect COVID-19 on food or surfaces available at the time of the incident.[37] However, as the insured, it still bears the burden to show an "accidental or unintentional contamination, impairment or mislabeling of an *Insured*

---

[36] R. Doc. 64-5 at 5 (citing R. Doc. 64-3 at 132-33, 155, 168-69).
[37] R. Doc. 61-1 at 11.

*Product(s) …* provided that the use or consumption of such *Insured Product(s)* has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s)." When asked at her deposition whether there was a circumstance where "a substance that can't be seen by the naked eye [satisfied] the terms of the policy … without scientific testing," Danielle Bouchard, the designated corporate representative of USSIC, responded: "Not that I can think of off the top of my head."[38] But Bouchard also testified that testing was not necessarily required to prove contamination "as long as there is evidence of that contamination."[39] The claims adjustor, Matt Hagan, did offer an alternative to the testing requirement (albeit extreme) in that he hypothesized that "if … 50 people dropped dead after eating at the restaurant" that would also be sufficient to prove coverage under the policy.[40] Together, this testimony confirms that while testing may be one means of demonstrating contamination, other means, including evidence of alternative, unexplained ill effects, are available.

      Of course, as New Orleans Equity argues, "[i]t would not be a reasonable interpretation of the policy to require that a product must first be put into commerce and injure somebody before triggering coverage." *Foster Poultry Farms, Inc. v. Certain Underwriters at Lloyd's, London*, 2016 WL 235211, at *5 (E.D. Cal. Jan. 20, 2016) (finding coverage under policy having a broader definition of "contamination," where federal agency specifically traced outbreaks of salmonella to insured plaintiff's facility by conducting inspection revealing an unsanitary infestation of cockroaches). However, in this case, under New Orleans Equity's theory, contaminated insured products were in fact given to customers: its expert, Dr. David W.K. Acheson, states in his report

---

[38] R. Doc. 61-8 at 4.
[39] R. Doc. 67-1 at 4-5.
[40] R. Doc. 61-9 at 4.

that "[i]n the course of [the employee's] shifts on March 10-13, restaurant receipts show that he served 18 cocktails, 10 salads, 2 shrimp remoulade salads, 2 iced teas, and 4 cold desserts to patrons."[41] Therefore, if the products were contaminated, some effects would presumably be seen. Yet, there has been no proof submitted by New Orleans Equity that any customer got sick from exposure linked to these items.

When no product has been shown to be contaminated, "harm to consumers was neither probable nor possible in this situation. … [The insured] is essentially asking the Court to rewrite the policy to require a likelihood that a product is contaminated rather than a likelihood that the contaminant it does contain is dangerous." *Little Lady Foods, Inc. v. Hous. Cas. Co.*, 819 F. Supp. 2d 759, 763 (N.D. Ill. 2011) (granting summary judgment in favor of insurer where there was no "accidental contamination" under insurance policy because none of the insured products were shown to be actually contaminated); *Wornick Co. v. Hous. Cas. Co.*, 2013 WL 1832671 (S.D. Ohio May 1, 2013) (same). At best, New Orleans Equity can only offer that there is a likelihood that the infected employee (the alleged contaminantor here) may have contaminated insured products. Dr. Acheson was unable to conclude any items were actually contaminated: "These items which all included uncooked components or garnishes *likely* had virus particles on them from [the employee's] pre-symptomatic shedding and were therefore vectors of exposure to the virus by patrons consuming them."[42] Absent any summary-judgment evidence that patrons actually contracted COVID-19 as a result of consuming the food they were served, New Orleans Equity has not demonstrated accidental contamination under the policy. The insured bears the burden of proof that its claim is covered by the insurance contract. *Doerr*, 774 So. 2d at 124. Here, on the summary-judgment record before the Court, New Orleans Equity has not carried its burden

---

[41] R. Doc. 61-18 at 6.
[42] *Id.* (emphasis added).

because they have not shown that accidental contamination occurred or the existence of any genuine issue of material fact that it did.[43]

### 3. Bad Faith

Without a valid claim for insurance coverage, there can be no claim for statutory penalties and attorney's fees against USSIC under Louisiana Revised Statutes 22:1892 and 22:1973. *See, e.g., Phillips v. Patterson Ins. Co.*, 813 So. 2d 1191, 1195 (La. App. 2002) (claim for statutory insurance penalties depends upon a "valid underlying insurance claim"). Thus, New Orleans Equity's bad faith claim necessarily falls.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion of plaintiff New Orleans Equity, L.L.C. for summary judgment on the issue of coverage (R. Doc. 61) is DENIED.

IT IS FURTHER ORDERED that the motion of defendant U.S. Specialty Insurance Company for summary judgment (R. Doc. 64) is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of defendant U.S. Specialty Insurance Company, and against plaintiff New Orleans Equity, L.L.C., DISMISSING plaintiff's claims with prejudice.

New Orleans, Louisiana, this 3rd day of August, 2021.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[43] Because the insured must prove every element of the insuring agreement and the Court holds that New Orleans Equity has not sustained its burden to show there was an accidental contamination (as defined by the policy), the Court need not and does not reach the questions whether the insured complied with the notice of incident provision as a condition precedent to coverage and whether it sustained a loss covered directly and solely by the accidental contamination it alleges.